ORAL ARGUMENT NOT YET SCHEDULED

NO. 13-7044 (lead case), 13-7045

UNITES STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**VENANCIO AGUASANTA ARIAS,** *et al.,*

**Plaintiffs-Appellants,**

**v.**

**DYNCORP,** *et al.,*

**Defendants-Appellees.**

**NESTOR ERMOGENES QUINTEROS,** *et al.,*

**Plaintiffs-Appellants,**

**v.**

**DYNCORP,** *et al.,*

**Defendants-Appellees.**

On Appeal from the U.S. District Court for the District of Columbia
(D.D.C. 1:01cv01908 (RWR) (*Arias*) & 1:07cv01042 (RWR) (*Quinteros*))

**APPELLANTS' OPENING BRIEF
PUBLIC COPY- SEALED MATERIAL REDACTED**

Terrence Collingsworth
Christian Levesque
CONRAD & SCHERER, LLP
1156 15th St. NW
Suite 502
Washington, DC 20005
Tel: 202-543-4001
Fax: 1-866-803-1125
tcollingsworth@conradscherer.com
clevesque@conradshcerer.com

Eric Hager
CONRAD & SCHERER, LLP
Avenida República de El Salvador 500 e
  Irlanda
Edificio Siglo XXI, PH Oficina W
Quito, Ecuador
Tel: 954-622-0461
Fax: 1-866-803-1125
ehager@conradscherer.com

*Counsel for Plaintiffs-Appellants*

AUGUST 29, 2013

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Plaintiffs-Appellants hereby certify as follows:

**A.   Parties and Amici Curiae**

Plaintiffs-Appellants in these matters are *Venancio Aguasanta Arias, et al.,* and *Nestor Ermogenes Quinteros,* e*t al.* A full list of Plaintiffs is attached as Exhibit 1 to the Certificate as to Parties, Rulings and Related Cases filed before this Court on March 27, 2013.

Defendants-Appellees in these matters are DynCorp, DynCorp Aerospace Operations LLC, DynCorp Aerospace Technology, DynCorp International, LLC, and DynCorp Techserv, LLC.

Amici who appeared before the district court were Amazon Alliance, John Bonine, Carl Bruch, Will Burns, Eagle Aviation Services &Technology, Inc., Earthrights International, Victor B. Flatt, Friends of the Earth US, Svitlana Kravchenko, Erika Lennon, W. Carroll Muffett, Marcos Orellana, John Pendergrass, Jacob Werksman, Chris Wold, and Durwood Zaelke.

**B.   Rulings Under Review**

The rulings under review are the following decisions of the United States District Court for the District of Columbia (U.S. District Judge Richard W. Roberts):

(1) Order (*Arias* Dkt. 174) entered on the 12th day of January, 2010, dismissing certain Plaintiffs, and the associated memorandum opinion (*Arias* Dkt. 173) entered on the same date, which is available at: *Arias v. DynCorp Aerospace Operations, LLC*, 677 F. Supp. 2d 330 (D.D.C. 2010). The memorandum opinion and order can be found in Appellants' Appendix at APP-00513 and APP-00521, respectively.

(2) Order (*Arias* Dkt. 219) entered on the 15th day of September, 2010, granting Defendants' Motion to Dismiss the Three Provincial Plaintiffs on the Pleadings, or, in the Alternative, for Summary Judgment, and the associated memorandum opinion (*Arias* Dkt. 218) entered on the same date, which is available at: *Arias v. Dyncorp*, 738 F. Supp. 2d 46 (D.D.C. 2010). The memorandum opinion and order can be found in Appellants' Appendix at APP-00648 and APP-00666, respectively.

(3) Memorandum Opinion and Order (*Arias* Dkt. 394, 400 (public redacted version)) entered on the 7th day of February, 2013, granting in part Defendants' Motion for Summary Judgment Based on the Lack of Necessary Expert Testimony, which is available at: *Arias v. DynCorp*, Civil Action Nos. 01–1908, 07–1042, 2013 WL 864566 (D.D.C. Feb. 6, 2013). The memorandum opinion can be found in Appellants' Appendix at APP-01211 (redacted) and APP-01537 (under seal).

(4) Order (*Arias* Dkt. 396) entered on the 19th day of February, 2013, granting in part Defendants' Motion to Exclude the Expert Testimony of Dr. Wolfson Pursuant to *Daubert v. Merrell Dow Pharmaceuticals* and Associated Motion for Summary Judgment, and the associated memorandum opinion (*Arias* Dkt. 395) entered on the same date, which is available at: *Arias v. DynCorp*, Civil Action Nos. 01–1908(RWR), 07–1042(RWR), 2013 WL 821168 (D.D.C. Feb. 19, 2013). The memorandum opinion and order can be found in Appellants' Appendix at APP-01177 and APP-01209, respectively.

## C.    Related Cases

The cases on review have not been before this Court on any previous occasion. Case No. 137044, *Venancio Aguasanta Arias, et al. v. DynCorp, et al.,* and Case No. 137045 *Nestor Ermogenes Quinteros, et al. v. Dyncorp Aerospace Operations, et al,* are related cases and were consolidated on appeal by Order of this Court on March 28, 2013.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ............. ii

PERTINENT STATUTES AND REGULATIONS ................................... 1

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 1

STATEMENT OF FACTS ................................................................... 2

SUMMARY OF ARGUMENT ............................................................. 5

ARGUMENT ................................................................................... 7

I.   STANDARD OF REVIEW ........................................................ 7

II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT AGAINST ALL PLAINTIFFS RATHER THAN
LIMITING SUMMARY JUDGMENT TO THE CLAIMS OF THE
TEST PLAINTIFFS ................................................................ 7

    A.   The District Court's Extension of Summary Judgment to the Non-
Test Plaintiffs Was Error Because the Non-Test Plaintiffs Never
Agreed to Be Represented by the Test Plaintiffs and DynCorp
Moved for Summary Judgment on the Test Plaintiffs' Claims Only ...... 9

        1.   The Non-Test Plaintiffs Never Agreed to Be Bound or
Represented By the Test Plaintiffs and the District Court Ruled
the Test-Plaintiff Plan Was For Informational Purposes Only ....... 9

        2.   DynCorp's Motions to Exclude Expert Testimony and for
Summary Judgment Were Directed at the Test Plaintiffs'
Claims *Only* ................................................................. 14

    B.   The District Court's Extension of Summary Judgment to the Non-
Test Plaintiffs Was Error Because Their Seventh Amendment Right
to a Jury Trial Was Violated ................................................ 16

v

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

C.   The District Court Erred Because Extending Summary Judgment to the Non-Test Plaintiffs Improperly Extended the Doctrines of Claim and Issue Preclusion ................................................................. 28

D.   The District Court Erred Because the Non-Test Plaintiffs Did Not Receive Notice Their Claims Could Be Dismissed .............................. 32

III.  THE DISTRICT COURT ERRED IN REQUIRING A GENERAL CAUSATION EXPERT FOR PLAINTIFFS' CROP DAMAGE CLAIMS ................................................................................................. 35

A.   Plaintiffs Did Not Need a General Causation Expert for Their Crop Damage Claims Because Glyphosate Is Indisputably Capable of Damaging Crops .................................................................... 36

B.   Even If Glyphosate's Effects on Crops Were Disputed, the Jury Would Not Need Expert Testimony to Decide Whether Glyphosate Can Cause Crop Damages .................................................. 38

IV.  THE DISTRICT COURT ERRED IN DISMISSING CAUSES OF ACTION NOT REQUIRING EXPERT TESTIMONY ON CAUSATION ....................................................................................... 42

V.   THE DISTRICT COURT ERRED IN DISMISSING THE PROVINCES FOR LACK OF STANDING ...................................................... 47

VI.  THE DISTRICT COURT ERRED IN DISMISSING 163 PLAINTIFFS FOR PURPORTEDLY INCOMPLETE QUESTIONNAIRE RESPONSES ............................................................... 52

CONCLUSION ...................................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

## CASES[1]

*Abbe v. v. City of San Diego, Cal.,*
    444 F. App'x 189, 189-90 (9th Cir. 2011) .....................................................31

*Adams v. Vertex, Inc.,*
    No. 04-01026, 2007 WL 1020788 (D.D.C. March 29, 2007) ................ 46-47

*Arizona v. California,*
    460 U.S. 605 (1983) ........................................................................................55

*Aviation Cadet Museum, Inc. v. Hammer,*
    283 S.W.3d 198 (Ark. 2008) ..........................................................................45

*B & W Management, Inc. v. Tasea Inv. Co.,*
    451 A.2d 879 (D.C. 1982) ..............................................................................45

*Baker v. Chevron USA, Inc.,*
    1:05-CV-227, 2011 WL 3652249 (S.D. Ohio Aug. 19, 2011)............... 26, 27

*Barnette v. Grizzly Processing, LLC,*
    809 F. Supp. 2d 636 (E.D. Ky. 2011) ....................................................... 43-44

*\*Bonds v. D.C.,*
    93 F.3d 801 (D.C. Cir. 1996) .............................................................. 7, 52-53

*Trakas v. Quality Brands, Inc.,*
    759 F.2d 185 (D.C. Cir. 1985) ........................................................................53

*Bostic v. Henkels and McCoy, Inc.,*
    748 A.2d 421 (D.C. 2000) ..............................................................................41

*Bottoni v. Sallie Mae, Inc.,*
    No. C 10–03602, 2011 WL 2293226 (N.D. Cal. June 8, 2011) ....................42

---

[1] Authorities upon which Appellants chiefly rely are marked with asterisks.

*Bowman v. Monsanto Co.,*
    133 S. Ct. 1761 (2013).................................................................37

*Bradgate Associates v. Fellows, Read & Associates, Inc.,*
    999 F.2d 745 (3d Cir. 1993) ........................................................20

*Brandes v. Mitterling,*
    196 P.2d 464 (Ariz. 1948) ...........................................................45

*Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.,*
    630 F.3d 217 (D.C. Cir. 2011).......................................................7

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..............................................................34, 35

*\*Cimino v. Raymark Indus.,*
    151 F.3d 297 (5th Cir. 1998) ...........................................21-24, 27

*City of Chanute, Kansas v. Williams Natural Gas Co.,*
    955 F.2d 641 (10th Cir. 1992) .....................................................21

*Claar v. Burlington N. Ry. Co.,*
    29 F.3d 499 (9th Cir. 1994) .........................................................26

*Council on American-Islamic Relations Action Network, Inc. v. Gaubatz,*
    793 F. Supp. 2d 311 (D.D.C. 2011)..........................................44-45

*D.C. v. Shannon,*
    696 A.2d 1359 (D.C. 1997) .........................................................41

*D.C. v. Zukerberg,*
    880 A.2d 276 (D.C. 2005) ...........................................................50

*Dammarell v. Islamic Republic of Iran,*
    404 F. Supp. 2d 261 (D.D.C. 2005)..............................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993).................................................................4, 28

*Davis v. Bud and Papa, Inc.,*
    885 F. Supp. 2d 85 (D.D.C. 2012)................................................ 38, 40, 42, 43

*Day v. Avery,*
    548 F.2d 1018 (D.C. Cir. 1976)....................................................................44

*Defenders of Wildlife v. Perciasepe,*
    714 F.3d 1317 (D.C. Cir. 2013).....................................................................7

*DeLuca v. Merrell Dow Pharmaceuticals, Inc.,*
    911 F.2d 941 (3d Cir. 1990) .........................................................................28

*Diaz v. Edgar,*
    831 F. Supp. 621 (N.D. Ill. 1993)..................................................................38

*Dodge v. Cotter Corp.,*
    203 F.3d 1190 (10th Cir. 2000) ........................................... 17, 21, 24, 28, 32

*Eggar v. Burlington N. Ry. Co.,*
    CV 89-159-BLG-JFB, 1991 WL 315487 (D. Mont. Dec. 18, 1991) ...........26

*Estate of Kurstin v. Lordan,*
    25 A.3d 54 (D.C. 2011) .................................................................................51

*Evans v. Washington Ctr. for Internships and Academic Seminars,*
    587 F. Supp. 2d 148 (D.D.C. 2008)...............................................................44

*Focus on the Family v. Pinellas Suncoast Transit Auth.,*
    344 F.3d 1263 (11th Cir. 2003) ............................................................. 50, 51

*Frierson v. SBC Global Servs., Inc.,*
    No. 11–1300–CV–W–ODS, 2013 WL 796559 (W.D. Mo. March 4, 2013) ...........................................................................................................42

*Hedgepeth v. Whitman Walker Clinic,*
    22 A.3d 789 (D.C. 2011) ...............................................................................46

*Hogan v. Allstate Ins. Co.,*
    361 F.3d 621 (11th Cir. 2004) ............................................................ 33, 34, 35

*Holmes v. Sec. Investor Prot. Corp.,*
    503 U.S. 258 (1992)........................................................................51

*In re Chevron U.S.A., Inc.,*
    109 F.3d 1016 (5th Cir. 1997) ........................................ 17, 23, 27

*In re Fibreboard,*
    893 F.2d 706 (5th Cir. 1990) ......................................................22

*In re Hanford Nuclear Reservation Litig.,*
    534 F.3d 986 (9th Cir. 2008) ......................................................18

*In re NBW Commercial Paper Litig.,*
    813 F. Supp. 7 (D.D.C. 1992)......................................................42

*\*In re TMI Litig.,*
    193 F.3d 613 (3d Cir. 1999) ...........................18-21, 24-26, 28, 32

*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and*
    *Prods. Liab. Litig.,*
    2010 WL 4024778 (S.D. Ill. Oct. 13, 2010)................................17

*Jimenez v. Hawk,*
    683 A.2d 457 (D.C. 1996) ................................................... 40, 41

*Johnson v. Manhattan R. Co.,*
    289 U.S. 479 (1933)....................................................................20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)....................................................................47

*Martin v. DOJ,*
    488 F.3d 446 (D.C. Cir. 2007)....................................................30

*In re Methyl Tertiary Butyl Ether (MTBE) Products,*
    1:00-1898, 2007 WL 1791258 (S.D.N.Y. June 15, 2007) ...........31

*Monsanto Co. v. David,*
    516 F.3d 1009 (Fed. Cir. 2008) ..................................................37

*Monsanto Co. v. McFarling*,
     363 F.3d 1336 (Fed. Cir. 2004) ....................................................37

*Morgan v. D.C.*,
     824 F.2d 1049 (D.C. Cir. 1987)............................................. 39, 40

*New Hampshire v. Maine*,
     532 U.S. 742 (2001).......................................................................29

*O'Neil v. Bergan*,
     452 A.2d 337 (D.C. 1982) ............................................................39

*Openshaw v. Consol. Eng'g Servs., Inc.*,
     No. 06–1884(CKK), 2007 WL 1087482 (D.D.C. Apr. 10, 2007) ..............46

*Pepper v. U.S.*,
     131 S. Ct. 1229 (2011)............................................................ 54-55

*Person v. Children's Hosp. Nat. Med. Ctr.*,
     562 A.2d 648 (D.C. 1989) ............................................................43

*Smalls v. United States*,
     471 F.3d 186 (D.C. Cir. 2006)......................................................30

*Smith v. Bayer Corp.*,
     131 S. Ct. 2368 (2011)................................................ 29, 30, 31

*Sowell v. Hyatt Corp.*,
     623 A.2d 1221 (D.C. 1993) ..........................................................46

*Tao v. Freeh*,
     27 F.3d 635 (D.C. Cir. 1994)..........................................................7

*Taylor v. Sturgell*,
     553 U.S. 880 (2008)................................................... 29, 30, 31

*Tice v. American Airlines, Inc.*,
     162 F.3d 966 (7th Cir. 1998) .......................................................25

*Tozzi v. U.S. Dept. of Health and Human Servs.,*
    271 F.3d 301 (D.C. Cir. 2001)......................................................................50

*Ulfik v. Metro-North Commuter R.R.,*
    77 F.3d 54 (2d Cir. 1996) ...........................................................................41

United States v. Hoover–Hankerson,
    511 F.3d 164 (D.C. Cir. 2007).....................................................................30

Washington v. Washington Hosp. Center,
    579 A.2d 177 (D.C. 1990) ...........................................................................38

Webb v. D.C.,
    146 F.3d 964 (D.C. Cir. 1998)................................................................ 7, 53

Wills v. Amerada Hess. Corp.,
    379 F.3d 32 (2d Cir. 2004) .................................................................. 40, 41

Wooddell v. Intern. Broth. of Elec. Workers,
    502 U.S. 93 (1991)............................................................................... 21-22

Young v. Burton,
    567 F. Supp. 2d 121 (D.D.C. 2008)....................................................... 35-36

## STATUTORY AUTHORITIES

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. §1331 ...........................................................................................1

28 U.S.C. § 1332(a)(2)..................................................................................1

28 U.S.C. § 1350 ..........................................................................................1

28 U.S.C. §1367 ...........................................................................................1

**RULES AND REGULATIONS**

Fed. R. App. P. 4 ................................................................................1

Fed. R. Civ. P. 42(b) ................................................................ 20, 21, 25

Fed. R. Civ. P. 56(f) .............................................................. 6, 9, 32, 35

**ADDITIONAL AUTHORITIES**

Manual for Complex Litigation (4th) ............................................. 10, 17

Restatement (Second) of Torts § 18................................................ 43, 44

Robert P. Stockwell, et al., *The Grammatical Structures of English and
    Spanish* (1965) ..............................................................................56

Silvina Montrul and Tania Ionin, *Transfer Effects in the Interpretation of
    Definite Articles by Spanish Heritage Speakers*, Bilingualism:
    Language and Cognition, Vol. 13, Issue 4 (Oct. 2010)................................56

T. Willging, *Trends in Asbestos Litigation* (Federal Judicial Center 1987)............37

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over these matters pursuant to: (a) 28 U.S.C. § 1332(a)(2), alienage jurisdiction, as the amount in controversy for each Plaintiff exceeds $75,000 and the action is between citizens of a State and citizens of a foreign state; (b) 28 U.S.C. § 1350, the Alien Tort Statute; (c) 28 U.S.C. §1331, federal question jurisdiction; and (d) 28 U.S.C. §1367, supplemental jurisdiction.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291, as these are appeals of a final order granting summary judgment entered on February 19, 2013. *See* Appellants' Appendix (hereinafter "APP") at APP-01209-01210. Plaintiffs-Appellants timely filed notices of appeal on March 18, 2013, in accordance with Federal Rule of Appellate Procedure 4. APP-01231; APP-01234.

## PERTINENT STATUTES AND REGULATIONS

There are no pertinent statutes or regulations.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred in granting summary judgment as to all Plaintiffs' claims rather than limiting summary judgment to the claims of the "test" Plaintiffs.

2.      Whether the District Court erred in requiring expert testimony for claims based on crop damages.

3.      Whether the District Court erred in dismissing common law claims that do not require any expert on causation.

4.      Whether the District Court erred in dismissing the claims of the provincial Plaintiffs for lack of standing.

5.      Whether the District Court erred in dismissing the claims of 163 Plaintiffs for purported insufficiencies in their questionnaire responses.

## STATEMENT OF FACTS

Factual Background

The individual Plaintiffs are Ecuadorians who sued the DynCorp Defendants for personal injuries and property damages resulting from DynCorp's reckless and negligent aerial spraying near the border of Colombia and Ecuador.  *See generally* APP-00225; APP-00256.  Three Ecuadorian provinces (Sucumbíos, Carchi, and Esmeraldas) sued DynCorp for "injury to their natural resources and [for] economic damages as a direct and proximate result of Defendants' unlawful conduct."  APP-00256, ¶ 7.  All Plaintiffs are only suing for damages occurring in Ecuador.  *Id.* ¶ 1.

The individual Plaintiffs grew legal crops, not illicit crops like coca.  APP-00981, ¶ 1.  They suffered a wide range of damages, including damages to their physical and mental health, their crops, and their animals.  APP-01163- 1173, ¶¶ 61-91; *see also Arias* Doc. No. 361 at pp. 4-5, 20-24 & 29.

2

The chemical mix DynCorp sprayed from planes, which contained glyphosate, caused Plaintiffs' injuries.  APP-00262, ¶ 25; APP-00997, ¶ 29. Glyphosate is indisputably capable of causing damage to the types of crops grown by Plaintiffs.  *See infra* Section III.A.

Although DynCorp was authorized to conduct certain spray operations in Colombia (APP-01381, 1384, 1386), without authorization it sprayed in neighboring Ecuador (APP-01380-1381), caused spray to drift into Ecuador (APP-01381-1384), and flew into Ecuador even when supposedly not spraying (APP-01385).

Procedural History

The *Arias* Plaintiffs filed their original complaint in the District Court for the District of Columbia on September 11, 2001.  APP-00001.  Although DynCorp filed a motion to dismiss on January 7, 2002, the District Court did not decide that motion until May 21, 2007.   APP-00115.  The District Court denied the motion to dismiss as to Plaintiffs' Alien Tort Statute and common law claims.  APP-00134.

The original group of *Quinteros* Plaintiffs filed an action in the District Court for the Southern District of Florida on November 21, 2006.  *See Quinteros, et al. v. Dyncorp Aerospace Operations LLC, et al.*, Case No. 06-cv-61760-WPD (S.D. Fla.).  On June 12, 2007, a combined *Quinteros* action that included subsequently-filed cases was transferred to the District Court for the District of

3

Columbia and consolidated with the *Arias* action for the purpose of case management and discovery. APP-00006. The first amended complaint in *Arias* contained 27 individual Plaintiffs and the first amended consolidated complaint in *Quinteros* contained 3,266 individual Plaintiffs and three provincial Plaintiffs. APP-00225, APP-00256.

Given the thousands of individual claims, Plaintiffs proposed a Test Plaintiff case management plan in the parties' joint Rule 16.3 statement on November 19, 2007. APP-00137. The District Court soon embraced the Test Plaintiff approach. *See infra* Section II.A.

Following the District Court's institution of a Test Plaintiff approach, and after the two interlocutory dismissal orders also being appealed here (APP-00521; APP-00666), the parties conducted fact and expert discovery. The parties then briefed summary judgment motions. With the District Court's permission, DynCorp filed seven summary judgment motions. APP-00094-00098. Two are relevant here. First, DynCorp filed a motion seeking to exclude Plaintiffs' expert, Dr. Michael Wolfson, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and requesting summary judgment on the Test Plaintiffs' claims only. APP-00667. Second, DynCorp sought summary judgment based on a purported lack of expert testimony, again asking for summary judgment on the Test Plaintiffs' claims only. APP-00720; APP-01237 (sealed version).

4

After ordering DynCorp to produce flight-related information it had withheld (APP-00760), the District Court gave the parties another opportunity to file motions for summary judgment. In July 2012, DynCorp filed all seven motions again. APP-00052-55. In both motions relevant here—the *Daubert* motion and the motion alleging a lack of expert testimony—DynCorp again only asked for summary judgment on the Test Plaintiffs' claims. APP-00781; APP-00836; APP-01297. DynCorp's limited requests in those motions contrasted sharply from other motions, where it sought summary judgment as to all Plaintiffs. *Compare* APP-00834 (proposed order for dismissal of the Test Plaintiffs' claims only) and APP-00877 (same) *to* APP-00780 (proposed order for dismissal of "all of the *Arias* and *Quinteros* plaintiffs' claims") and APP-00878 (same). Nonetheless, the District Court, without explanation, granted summary judgment as to all Plaintiffs. APP-01209-01210. It denied as moot all of the other pending motions for summary judgment. APP-01210.

## SUMMARY OF ARGUMENT

Plaintiffs seek reversal of five rulings by the District Court.

First, the District Court erred in granting summary judgment as to all Plaintiffs for several reasons: 1) the Non-Test Plaintiffs never consented to be bound or represented by the Test Plaintiffs; 2) granting summary judgment as to all Plaintiffs violated the Non-Test Plaintiffs' Seventh Amendment right to a jury trial;

5

3) in granting summary judgment against all Plaintiffs, the District Court violated

established principles of claim and issue preclusion; and 4) the District Court never

provided the Non-Test Plaintiffs with notice, pursuant to Federal Rule of Civil

Procedure 56(f), that their claims may be dismissed.

Second, the District Court erred in requiring a general causation expert for

crop damage claims.  The chemical at issue, glyphosate, is indisputably capable of

damaging crops.  Even if glyphosate's characteristics were disputed, the jury

members could determine it is capable of causing crop damages without expert

testimony by relying on their common sense.

Third, the District Court erred in dismissing causes of action that do not

require any expert on causation.  The District Court should have, but did not,

analyze the elements of Plaintiffs' claims individually to determine if an expert

was required for each claim.

Fourth, the District Court erred in dismissing the claims of the provincial

Plaintiffs for lack of standing.  As a result of DynCorp's spraying, the provincial

Plaintiffs spent funds on education and health care, which is sufficient for standing.

Fifth, the District Court erred in dismissing the claims of 163 Plaintiffs for

purported insufficiencies in their questionnaire responses.  The District Court's

sanction of dismissal with prejudice was too harsh and it improperly applied a

different standard for the sufficiency of questionnaire responses than it had previously announced.

## ARGUMENT

### I.     STANDARD OF REVIEW

This Court's "review of the grant of summary judgment is *de novo*, applying the same standards as the district court." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994); *see also Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217, 224 (D.C. Cir. 2011) (reviewing *de novo* grant of summary judgment based on failure to present expert testimony). It also reviews dismissals for lack of standing *de novo*. *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013). Finally, it reviews the imposition of discovery sanctions for abuse of discretion. *Bonds v. D.C.*, 93 F.3d 801, 808 (D.C. Cir. 1996). Nonetheless, the Court's "review should be a thorough, not a cursory, one." *Webb v. D.C.*, 146 F.3d 964, 971 (D.C. Cir. 1998).

### II.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST ALL PLAINTIFFS RATHER THAN LIMITING SUMMARY JUDGMENT TO THE CLAIMS OF THE TEST PLAINTIFFS

The District Court granted summary judgment against all Plaintiffs based on its holdings that the Test Plaintiffs failed to present admissible expert testimony on general causation as it related to their personal injury claims, and failed to present any expert testimony on general causation as it related to their claims for crop and

7

animal damages.  APP-01207-01208; APP-01209; APP-01220-01221.  Without

any analysis, it extended these rulings to the Non-Test Plaintiffs.  APP-01210

(closing the case as to all Plaintiffs).   It was error for the Court to grant summary

judgment against *all* Plaintiffs for their personal injury claims, as well as for *all*

Plaintiffs' claims for crop and animal damages, and it was error to dismiss any

claims that do not require expert testimony.  *See infra* Sections II.; III; IV.

The District Court's grant of summary judgment against all Plaintiffs was

error for several reasons.  First, the undisputed record shows the Non-Test

Plaintiffs never agreed to be represented by the Test Plaintiffs, the case

management plan was implemented for informational purposes, and any outcome

as to the Test Plaintiffs was intended to inform future case efforts in terms of

structuring settlement or future trial procedures.  Additionally, DynCorp moved for

summary judgment *only* on the Test Plaintiffs' claims.  Second, the District Court

erred because applying the summary judgment rulings to the Non-Test Plaintiffs

violated their Seventh Amendment right to a jury trial.  Third, extending the

District Court's summary judgment rulings to all Plaintiffs was error because the

Court violated established principles of claim and issue preclusion.  Finally, the

District Court erred because it failed to provide the Non-Test Plaintiffs with any

notice before entering summary judgment against them, as required by Federal

Rule of Civil Procedure 56(f).

8

For all these reasons, the District Court erred and its summary judgment as to the Non-Test Plaintiffs should be reversed.[2]

**A.  The District Court's Extension of Summary Judgment to the Non-Test Plaintiffs Was Error Because the Non-Test Plaintiffs Never Agreed to Be Represented by the Test Plaintiffs and DynCorp Moved for Summary Judgment on the Test Plaintiffs' Claims Only**

The record is clear in this non-class action that the purpose of selecting Test Plaintiffs was to provide information and guidance concerning the best way to manage the more than 2,000 other individual cases against DynCorp.  Moreover, the Non-Test Plaintiffs never agreed to be bound or represented by the Test Plaintiffs.  Additionally, DynCorp moved for summary judgment on the Test Plaintiffs' claims only.

**1.  The Non-Test Plaintiffs Never Agreed to Be Bound or Represented By the Test Plaintiffs and the District Court Ruled the Test-Plaintiff Plan Was For Informational Purposes Only**

The Test-Plaintiff case management plan was first proposed by Plaintiffs' counsel in the November 19, 2007 joint Rule 16.3 statement regarding scheduling. Plaintiffs proposed this "mass tort action be managed for discovery and trial

---

[2] Although the Test Plaintiffs do not seek reversal of summary judgment in its entirety, they do seek reversal of certain rulings which would allow some of their claims to go forward, including their claims for crop damages and their claims under certain causes of action not requiring a general causation expert.  *See* Sections III & IV.

purposes in phases." APP-00137.  Plaintiffs further proposed "a group of trial

Plaintiffs be selected for focused discovery and trial . . . limited to the first group of

trial Plaintiffs . . . ." *Id.* "Upon completion of the first phase of individual Plaintiff

trials, the Court and parties will discuss global resolution and schedule additional

Plaintiff groups for trial . . . ." *Id.*

Plaintiffs contended "[t]he use of test cases is a well recognized case

management technique which can provide substantial information that may assist

in resolution of complex mass-tort actions."  APP-00156 (citing Manual for

Complex Litigation (4th) § 22.315).  Plaintiffs made clear they were *not* proposing

a "bellwether" approach with a statistically significant and randomized sample of

Plaintiffs.  APP-00157.[3]  They noted by not using a "bellwether approach," the

findings in any trial "may not be applied to all Plaintiffs, . . . [but t]his is a small

price to pay for the increased efficiency of an alternative trial group selection

process."  *Id*.  Moreover, Plaintiffs noted they proposed "[a]n alternative approach,

which can provide substantial information to assist in global resolution of this

matter, [and would] allow Plaintiffs to select the first group of trial Plaintiffs."

APP-00157.

_____

[3] Courts have often used the terms "test plaintiffs" and "bellwether plaintiffs"
without attaching a binding or non-binding nature to either.  *See infra* Section II.B.
Regardless of which term is used, Plaintiffs and the District Court were clear in
this case that the Test-Plaintiff case management plan was for informational
purposes only and Plaintiffs did not agree to use a binding bellwether approach.
*See infra* Section II.A.

Plaintiffs identified the benefits of a "Plaintiff-selected group of trial Plaintiffs," which was to allow DynCorp to "asses its maximum potential exposure." APP-00158. It was clear that Plaintiffs' selection of the Test Plaintiffs was for informational purposes only because "[i]f DynCorp were to defense the 'best' Plaintiff picks, that is quite telling of the value of the remainder of the case." *Id.* Similarly, a trial on a test group of Plaintiffs would also provide information as to issues relevant in Plaintiffs' assessment of the cases going forward. APP-00159.

Initially, at a November 27, 2007 status conference, the District Court indicated it wanted to follow the "sampling" approach suggested by Plaintiffs, but with the addition that the parties each select some of the Test Plaintiffs. APP-00190 at 10:18-11:5. Such a sample, the Court noted, would be helpful "if everybody is interested in trying to use that first sample for purposes of making hard judgments about going forward and perhaps dwindling down the amount of time and money and resources needed to go beyond that initial group . . . ." *Id.* Indeed, nothing in the Court's initial discussions indicates the purpose of selecting Test Plaintiffs was to bind Non-Test Plaintiffs. If it were, there would be no point in referencing next steps about reducing time and money beyond the initial group.

The District Court reiterated the purpose of the Test Plaintiff approach the following year at a November 25, 2008 status conference in which it noted the point of the plan was "to give everybody a broad idea of what we have and what

11

we don't have." APP-00307 at 27:24-28:1. Additionally, although the Court was leaving the selection of the Test Plaintiffs to the parties, it was encouraging the parties to select some kind of representative sample if the goal was to "narrow[ ] down the number of . . . test trials or identify[ ] in some realistic way what playing field [they] should be on with respect to potentially discussing some kind of global settlement." APP-00308 at 28:6-12.

On March 23, 2009, the parties submitted separate proposals for the selection of sample trial Plaintiffs. APP-00406. Plaintiffs again indicated the objective of such a proposal was to "form a meaningful foundation for settlement or other resolution of the balance of the case." APP-00410. They proposed Plaintiffs' counsel should select the Test Plaintiffs alone, as they were in the best position to do so. APP-00411-00413. Plaintiffs objected to the "random selection approach" proposed by DynCorp and noted Plaintiffs' proposal would "best educate all the parties about the strength and weaknesses of the claims as a whole." APP-00413.

On July 17, 2009, again in a status conference, the Court altered its prior position that the parties would each select a group of Test Plaintiffs (APP-00190 at 10:18-11:5), and instead ordered only the Plaintiffs to make such a selection. APP-00462 at 35:25-36:25. In advising on the selection of test cases, the Court stated:

> there would be a lot more instructive outcome for everybody if you
> mix in some others, because if you only take the strongest in the

12

> beginning, there is going [sic] to be opportunity to have the weakest
> get put on, and it may only sort of prolong things before both sides get
> a full opportunity to . . . see how the weak cases play out and what
> impact that may eventually have on any theoretical settlement
> discussions in the future.

APP-00463 at 36:5-12.  The Court's statement again makes clear any adjudication

of the first phase Test Plaintiffs' claims would not bind any other Plaintiffs.

After Plaintiffs filed a motion for clarification of the Court's order on

October 6, 2009 regarding the selection of the Test Plaintiffs (APP-00498), the

District Court ruled on that motion in a status conference held on April 30, 2010,

again indicating the non-binding nature of the Test Plaintiff approach:

> The aim has been in this I guess mass tort litigation to identify a test
> group of plaintiffs and to prepare the cases potentially for trial, if they
> have to go to trial without being able to be settled first, and then once
> the results of the trial are in for the test group of plaintiffs, ***allow those
> results to inform the future direction of case efforts, be it toward
> settlement or structuring procedures for additional trials.***

APP-00525 at 4:3-10 (emphasis added).[4]

The record is clear the parties did not intend for the adjudication of

the first phase trial on Test Plaintiffs' claims to bind Non-Test Plaintiffs, nor

did they intend for the Test Plaintiffs to represent them in this non-class

action case.  Similarly, the District Court's reasoning and express

clarification indicates that regardless of the outcome of any Test Plaintiffs'

---

[4] Discovery as to the *Arias* plaintiffs did not end with the deadline for discovery as
to the first phase trial group in *Quinteros* (of which no *Arias* Plaintiff was a part).
APP-00526 at 5:13-6:5.

claims, there would be another phase – either the outcome would inform

settlement discussions or additional trials or procedures would follow.  *Id.*

      **2.**    **DynCorp's Motions to Exclude Expert Testimony and for Summary Judgment Were Directed at the Test Plaintiffs' Claims *Only***

Pursuant to the District Court's order allowing resubmission of certain

briefing, on July 11, 2012, DynCorp filed a renewed "Motion to Exclude the

Testimony of Plaintiffs' Sole Expert . . . ."  APP-00781.[5]  DynCorp contended the

Test Plaintiffs' expert's opinions "should be excluded in their entirety and, because

expert causation testimony is required to support all of the *Arias*/*Quinteros*

plaintiffs' claims*, summary judgment should be granted in favor of defendants as

to the twenty test plaintiffs*."  APP-00791 (emphasis added).  DynCorp noted,

> Dr. Wolfson has no basis to opine *as to the test plaintiffs'* specifically alleged medical conditions. He did not examine *any of the test plaintiffs,* did not review *any of the test plaintiffs'* medical records, has no relevant knowledge about *the test plaintiffs'* unsanitary living conditions or background health risks, and cannot exclude alternative factors identified in the literature (and in some of the *test plaintiffs'* own medical records) as the actual causes of the ailments *the test plaintiffs allege*.

---

[5] DynCorp's motion to exclude expert testimony references an "associated" motion for summary judgment.  APP-00781; APP-00833.  DynCorp's "associated" motion for summary judgment for a lack of experts, however, was filed separately.  APP-00836.

APP-00790 (emphasis added).[6]  DynCorp concluded all "***the Test Plaintiffs'*** legal claims require expert testimony" and the exclusion of their expert's testimony necessitated grating summary judgment.  APP-00833 (emphasis added).

Similarly, pursuant to the District Court's order, DynCorp renewed its "Motion for Summary Judgment Based on the Plaintiffs' Lack of Necessary Expert Testimony" on July 17, 2012. [7]  APP-00836.  DynCorp sought dismissal of the Test Plaintiffs' claims only, as the motion did not pertain to the Non-Test Plaintiffs.  For example, DynCorp "move[d] for summary judgment on ***all of the test plaintiffs' claims*** . . . ."  APP-00842 (emphasis added).  Further, DynCorp explicitly states: "[o]n these fundamental elements of their claims, ***the test plaintiffs*** have proffered no expert evidence whatsoever.  Accordingly, regardless of the admissibility of Dr. Wolfson's opinions, plaintiffs cannot meet their summary judgment burden on any of their claims, and all of the ***test plaintiffs' claims*** should be dismissed."  APP-00843 (emphasis added).  The basis of DynCorp's motion for summary judgment, it contended, was "[***t]he test plaintiffs'*** failure to proffer the expert testimony . . . ."  APP-00847 (emphasis added).

---

[6] Dr. Wolfson's report pertained only to the twenty Test Plaintiffs, as he exclusively reviewed the deposition testimony and questionnaires of those twenty individuals.  APP-00936.

[7] This motion was virtually identical to DynCorp's earlier motion for summary judgment, which was filed on August 16, 2011.  APP-00720.  DynCorp produced additional discovery after the Court ruled on a motion to reconsider and, as a result, the Court allowed the parties to re-file certain briefs to take into consideration, if necessary, the new discovery.  APP-00760; APP-01277.

15

Moreover, DynCorp's statement of material facts is entirely specific to the Test Plaintiffs, who were the only Plaintiffs from whom extensive discovery, such as depositions, was taken. APP-00847-00855.

There is no doubt DynCorp moved for summary judgment on the Test Plaintiffs' claims *only* and, as addressed below, the District Court's grant of summary judgment against the Non-Test Plaintiffs was error.

**B.      The District Court's Extension of Summary Judgment to the Non-Test Plaintiffs Was Error Because Their Seventh Amendment Right to a Jury Trial Was Violated**

The District Court erred because granting summary judgment against all Non-Test Plaintiffs violated their substantive rights, including their Seventh Amendment right to a jury trial.  Courts must consider whether the substantive rights of non-test plaintiffs are adequately protected before extending summary judgment or trial verdicts concerning test plaintiffs to non-test plaintiffs.  In this case, the record is clear there was no agreement or intention to bind the Non-Test Plaintiffs, and the District Court failed to provide any analysis whatsoever concerning why it extended summary judgment to the Non-Test Plaintiffs.  Under such circumstances, the Non-Test Plaintiffs' substantive rights were not adequately protected and they cannot be bound by adjudications against the Test Plaintiffs.[8]

---

[8] The D.C. Circuit has not yet addressed the circumstances under which a test plaintiff or bellwether trial can bind non-test plaintiffs.  Test or bellwether trials or proceedings, however, have been used by district courts within this Circuit.  *See,*

*See, e.g., Dodge v. Cotter Corp.*, 203 F.3d 1190, 1200 (10th Cir. 2000) (reversing

district court's partial summary judgment, which had been entered against non-test

plaintiffs on negligence issue because"[i]f the parties intended to bind subsequent

litigation with the results of prior test trials, the record must clearly memorialize

that agreement. Their failure to do that here leaves important substantive rights at

the mercy of trial tactics."); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir.

1997) (holding test plaintiff results could not bind non-test plaintiffs).[9] *Cf. In re*

---

*e.g., Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 271  n.1 (D.D.C. 2005) (in a mass tort case brought by victims of terrorism against foreign states, "[f]or purposes of case management, the Court limited the . . . presentation of evidence to a group of twenty-nine plaintiffs" and the "claims of  the remaining victims and families ('the Phase II litigants') were referred to Magistrate Judge John Facciola for the purpose of receiving evidence of their damages and issuing factual findings with respect to their claims").

[9]Indeed, the modern trend concerning test plaintiff or bellwether cases is for them to be non-binding and for informational purposes.  For example, Federal Judge Eldon E. Fallon, who has presided over several multidistrict cases utilizing a non-binding bellwether process, explains the benefits of the modern "informational," non-binding approach and contrasts this with earlier binding approaches. *See* Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev. 2323, 2337-42 &  n.27 (2008); *see also In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*, 2010 WL 4024778, at *1 (S.D. Ill. Oct. 13, 2010) (citing Fallon, et al., *Bellwether Trials in Multidistrict Litig.*); Manual for Complex Litigation (4th) § 22.315 (noting the purpose of "test," or "bellwether," trials is purely informational. They are a tool used "to produce reliable information about other mass tort cases," and "to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis and what range of values the cases may have if resolution is attempted on a group basis."); *id.* § 20.312 (designed to facilitate "settlement discussions based upon the results of the test cases"); *id.* § 20.132 (bellwether trial *may* be binding, but *only* with the consent of the affected parties).

*Hanford Nuclear Reservation Litig.,* 534 F.3d 986, 1008 (9th Cir. 2008) (deciding a purely legal issue concerning the statute of limitations, but recognizing "the results of the Hanford bellwether trial [were] not binding on the remaining plaintiffs" and noting the purpose of the bellwether trial was to "establish the relative strengths and weaknesses of the parties, spread out mainly for settlement purposes" and to be a "learning process").

In a case with strikingly similar circumstances as this case, the Third Circuit determined that non-trial plaintiffs could *not* be bound by the district court's summary judgment ruling because the substantive rights of the non-trial plaintiffs were not adequately protected. *In re TMI Litig*., 193 F.3d 613, 623 (3d Cir. 1999). In *TMI,* approximately 2,000 plaintiffs brought individual claims in a consolidated (non-class action) case for injuries related to the 1979 Three Mile Island (TMI) nuclear reactor accident. *Id.* at 622. The parties selected a group of ten test plaintiffs. At issue was the test plaintiffs' ability to show causation relating to the health effects of radiation exposure, which depended on the admissibility of expert testimony. *Id.* at 623. After the district court excluded the test plaintiffs' expert testimony, the defendants moved for summary judgment arguing the plaintiffs could not establish causation absent the excluded expert testimony regarding the sufficiency of the dose of radiation to cause their individual injuries (neoplasms). *Id*. at 623, 628, 723. The district court agreed and held, as a result of its rulings

18

under *Daubert*, the trial plaintiffs were unable to connect their neoplasms to the TMI accident. *Id.* at 623. The district court then reasoned that to the extent the ruling turned on broad evidentiary issues common to all plaintiffs, its *Daubert* rulings would be binding on all non-trial plaintiffs. *Id.* at 623, 628, 723. Because the court found no Plaintiff would be able to state a prima facie case without adequate dose evidence, the court extended its summary judgment decision to the non-trial plaintiffs, and granted summary judgment to the defendants on all the claims of the approximately 2,000 remaining personal injury plaintiffs. *Id.* at 623, 628, 723.

On appeal in *TMI*, the Third Circuit reversed the grant of summary judgment on the non-trial plaintiffs' claims and rejected the district court's reasoning. *Id.* at 723-27. The non-trial plaintiffs argued on appeal that the extension of summary judgment to them was improper because, among other reasons, (1) their cases were consolidated for administrative purposes only; (2) they had not stipulated the trial plaintiffs would bind them; (3) they had a right to present different proofs, experts and theories of recovery than those presented by the trial plaintiffs; and (4) as the case was not a class action, they were never given the opportunity to "opt-out" of a consolidated trial. *Id.* at 723.

The Third Circuit based its reversal on several distinct grounds. First, it held "[c]onsolidation 'does not merge the suits into a single cause, or change the rights

19

of the parties, or make those who are parties in one suit parties in another.'" *Id.* at

724 (quoting *Johnson v. Manhattan R. Co.*, 289 U.S. 479, 497 (1933)). "'[W]hile

consolidated cases may be treated as one lawsuit in order to conserve judicial

resources, the procedure should not impose the heavy toll of a diminution of any

party's rights.'" *Id.* (quoting *Bradgate Associates v. Fellows, Read & Associates,*

*Inc.*, 999 F.2d 745, 750 (3d Cir. 1993)).  Essentially, "consolidation is not intended

to affect the substantive rights of the parties to the consolidated cases." *Id.*  The

appellate court noted, there was "nothing [in the procedural history] to indicate that

the Non-Trial Plaintiffs were given an opportunity to object to the defendants'

motion for summary judgment or otherwise protect their substantive claims." *Id.*

at 725.

Second, the Third Circuit reversed because the non-trial plaintiffs' Seventh

Amendment right to a jury trial was violated.  *Id.*  The court noted Federal Rule of

Civil Procedure 42(b)'s admonition to "always preserv[e] inviolate the right of trial

by jury as declared by the Seventh Amendment"[10] and stated, "[s]ummary

---

[10] Rule 42(b) states:

> The court, in furtherance of convenience or to avoid prejudice, or
> when separate trials will be conducive to expedition and economy,
> may order a separate trial of any claim, cross-claim, counterclaim, or
> third-party claim, or of any separate issue or of any number of claims,
> cross-claims, counterclaims, third-party claims, or issues, *always*
> *preserving inviolate the right of trial by jury as declared by the*
> *Seventh Amendment to the Constitution or as given by a statute of the*
> *United States.* (emphasis added).

20

judgment does not violate a party's Seventh Amendment jury trial rights so long as the person having the right to the jury trial is an actual participant in the summary judgment proceeding." *Id.* (citing *City of Chanute, Kansas v. Williams Natural Gas Co.*, 955 F.2d 641, 657 (10th Cir. 1992)). "However, absent a positive manifestation of agreement by Non-Trial Plaintiffs, we cannot conclude that their Seventh Amendment right is not compromised by extending a summary judgment against the Trial Plaintiffs to the non-participating, non-trial plaintiff." *Id.*

Courts in other circuits have expressed similar concerns about protecting Seventh Amendment jury trial rights and have held the results of test plaintiff trials or summary judgment against test plaintiffs were not binding on non-test plaintiffs. *See, e.g., Dodge*, 203 F.3d at 1200 (referencing the "substantive rights protected by the Seventh Amendment"). For example, the Fifth Circuit has held non-test plaintiffs' Seventh Amendment rights are violated by trial plans that do not allow each Plaintiff to present evidence. *See Cimino v. Raymark Indus.*, 151 F.3d 297, 300, 338 (5th Cir. 1998). In *Cimino*, the appellate court reversed the district court's holding that results from 160 sample trials in an asbestos action with more than 3,000 cases could be extrapolated to the remaining cases because they were "reliably representative." *Id.* at 300, 338. The Fifth Circuit noted "personal injury tort actions for monetary damages are 'a prototypical example of an action at law, to which the Seventh Amendment applies.'" *Id.* at 311 (quoting *Wooddell v.*

*Intern. Broth. of Elec. Workers*, 502 U.S. 93, 98(1991)).  Indeed, "any

implemented trial plan [must] include a litigated determination, consistent with the

Seventh Amendment . . . whether, as to each individual plaintiff, [defendant's]

product was the cause of his complained-of condition and, if so, the damages that

plaintiff suffered as a result." *Id.* at 314.[11]

Importantly, *Cimino* clarified the holding of a previous Fifth Circuit case,

*Chevron*, which has occasionally been cited as suggesting that bellwether trials

may be binding in limited circumstances.  151 F.3d at 318-19.   *Chevron* concerned

a bellwether trial plan that "provided for a unitary trial on the issues of 'general

liability or causation'" with thirty bellwether plaintiffs, fifteen chosen by each side.

109 F.3d at 1017.  Chevron had contended "the goal of the 'unitary trial' was to

---

[11] The Fifth Circuit's decision in *Cimino* considered "the same set of cases
addressed in *In re Fibreboard*, 893 F.2d 706 (5th Cir. 1990), but the judgments . . .
before [it] result[ed] from a trial plan modified following that decisio *n.*"  *Cimino*,
151 F.3d at 299.  In *Fibreboard*, 3,000 plaintiffs with asbestos-related injuries
brought claims against several companies.  A three-part process was created to
streamline the trial:  in phase I, the common defenses and punitive damages would
be tried before a jury; in phase II, 41 representative cases would be fully tried
before the same jury, who would decide the total liability *as to the whole class;* in
phase III, any awarded damages would be distributed.  893 F.2d at 707.  The 41
test plaintiffs included 15 chosen by each side, plus the 11 class representatives.
*Id.* at 709.  Despite these procedural safeguards – which were *not* present in this
case against DynCorp – the Fifth Circuit was left with a "profound disquiet" about
the procedure, given the disparities among the 3,000 plaintiffs and the single
"omnibus" damage award.  *Id.* at 710.  That court held "Phase II, while offering an
innovative answer to an admitted crisis in the judicial system," violated Texas state
law and raised questions regarding "whether defendants' right to trial by jury [wa]s
being faithfully honored . . . ."  *Id.* at 711-12.

determine its liability, or lack thereof, in a single trial and to establish bellwether verdicts to which the remaining claims could be matched for settlement purposes." *Id.* The Fifth Circuit held there could be no preclusive effect because in order for test plaintiffs to bind all plaintiffs, the composition of the test group "must be based on competent, scientific, statistical evidence that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect results that would be obtained from trials of the whole." *Id.* at 1020.

The Fifth Circuit in *Cimino* clarified that *Chevron* expressly prohibited "utilization of the results obtained from the trial of the thirty (30) selected cases *for any purpose* affecting issues or claims of, or defenses to, the remaining untried cases." *Cimino*, 151 F.3d at 318 (emphasis added). Moreover, *Cimino* noted to the extent any language in *Chevron* could be read as "generally looking with favor on the use of bellwether verdicts when shown to be statistically representative, this language is plainly *dicta,* certainly insofar as it might suggest that representative bellwether verdicts could properly be used to determine *individual* causation and damages for other plaintiffs." *Id.* (italics in original). Instead, *Chevron* "prevent[ed] *any* preclusive use of the unitary trial results (whether for general causation *or* individual causation or otherwise) in cases other than those of the thirty selected plaintiffs." *Id.* (italics in original); *see also id.* at 318 *n.*45.

23

In this case, the District Court adopted Plaintiffs' Test Plaintiff proposal. APP-00462 at 35:25-36:25. The Non-Test Plaintiffs did not participate in depositions, respond to Rule 34 document requests, or otherwise participate in extensive discovery like the Test Plaintiffs – because the whole purpose of the Test-Plaintiff case management plan was to proceed through focused discovery and an initial trial on only the Test Plaintiffs' claims. APP-00137; *see also supra* Section II.A.1. The Non-Test Plaintiffs never agreed to be represented by the Test Plaintiffs or otherwise bound by any adjudication against them. *See, e.g.*, APP-00158; *see also supra* Section II.A.1. Additionally, the Non-Test Plaintiffs had no opportunity to present arguments or evidence of their own, or to object or otherwise opt-out of the Test Plaintiff case, before the District Court entered summary judgment against them. *See infra* Section II.D; *see also, e.g., Dodge*, 203 F.3d at 1199-1200 (rejecting arguments to bind non-test plaintiffs where the record, including jury instructions, was not clear as to the binding nature); *TMI*, 193 F.3d at 725 (holding test plaintiffs did not bind non-test plaintiffs in the absence of a clear "manifestation" to be bound); *Cimino*, 151 F.3d at 318-21 (disapproving of the use of bellwether trials).

In *TMI*, the claims of thousands of plaintiffs were consolidated, but the principles apply with equal force to this case. Here, thousands of individuals with separate personal injuries are Plaintiffs in the *Quinteros* case. *See supra* Statement

of Facts, Procedural History, at pp. 3-4.  The *Quinteros* case was consolidated with

the *Arias* case, which had only 27 plaintiffs.  *Id.*  Nevertheless, whether individual

cases are consolidated or brought together in a mass action that is not a class

action, each individual's substantive rights are not extinguished.  Indeed, each

Non-Test Plaintiff has his own right to a jury trial under the Seventh Amendment.

*See Tice v. American Airlines, Inc.*, 162 F.3d 966, 968 (7th Cir. 1998) ("It is a

fundamental principle of American law that every person is entitled to his or her

day in court.  Multiple victims of . . . disasters . . . normally may all bring their

own suits even if the defendant engaged in a single course of action that affected

everyone similarly."); *TMI*, 193 F.3d at 725 (citing Fed. R. Civ. P. 42(b)).

Additionally, unlike in *TMI* where the summary judgment movants made

clear they were seeking summary judgment as to all plaintiffs, 193 F.3d at 628,

here, DynCorp's motions expressly sought summary judgment *only* against the

Test Plaintiffs.  *See supra* Section II.A.2.  Moreover, as the Third Circuit held in

*TMI*, the District Court's holding that expert testimony was inadmissible or that an

expert is needed to demonstrate causation cannot justify binding the Non-Test

Plaintiffs – even when the court believes the issues are global and affect every

plaintiff.  *See* 193 F.3d at 723-26 (rejecting district court's reasoning that summary

judgment applied to all plaintiffs because all needed to provide expert testimony on

dose in order to survive summary judgment).

25

Further, other courts, after excluding expert testimony on common issues have limited those holdings to the test plaintiffs and the non-test plaintiffs have had a full and fair opportunity to present expert testimony to satisfy *Daubert* later in the proceedings.  *See*, *e.g.*, *Claar v. Burlington N. R. Co.,* 29 F.3d 499 (9th Cir. 1994), *aff'g sub nom. Eggar v. Burlington N. R. Co.,* CV 89-159-BLG-JFB, 1991 WL 315487, at *11 (D. Mont. Dec. 18, 1991) (granting summary judgment against the six test-plaintiffs because their expert opinion on causation was excluded, but not extending the holding to the non-test plaintiffs) (granting summary judgment against the six test-plaintiffs because their expert opinion on causation was excluded, but not extending the holding to the non-test plaintiffs).  Similarly, in *Baker v. Chevron USA, Inc.*, the district court granted summary judgment on the bellwether plaintiffs' claims because their expert was excluded under *Daubert* but the remaining non-bellwether plaintiffs were not dismissed.  *See* 1:05-CV-227, 2011 WL 3652249, at *2 & *n.*4 (S.D. Ohio Aug. 19, 2011) , *aff'd sub nom. Baker v. Chevron U.S.A. Inc.*, 11-4369, 2013 WL 3968783 (6th Cir. Aug. 2, 2013) (noting that after summary judgment was granted to Chevron on the claims of the bellwether plaintiffs, Chevron brought a motion for summary judgment addressing the claims of the remaining plaintiffs).  Instead, the remaining plaintiffs were permitted to "attempt[ ] to meet the district court's criticism of the bellwether claims with new expert opinions . . . ."  2013 WL 3968783, at *6.

26

Finally, regardless of whether a truly representative sample can ever bind non-test plaintiffs, in this case, there is no doubt Plaintiffs' unitary selection of all Test Plaintiffs without scientific or statistical analysis was not a representative sample of the entire Plaintiff pool, nor did the District Court employ procedural safeguards. *See supra* Section II.A.1; *see also, e.g., Cimino*, 151 F.3d at 318-19 (holding that even when the selection process is representative of all plaintiffs, this is not sufficient to bind the parties outside of the bellwether group because they have an individual right to a trial by jury); *Chevron*, 109 F.3d at 1020 (expressing concern that the procedure embodied in the district court's trial plan "was devoid of safeguards" designed to ensure the non-represented plaintiffs' claims as to liability and causation were "determined in a proceeding that was reasonably calculated to reflect the results that would be obtained if those claims were actually tried."); *see also id.* at 1020-21 (noting that permitting "the extinguishment of claims or the imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs" is "inherently unfair when the substantive rights of both plaintiffs and the defendant are resolved in a manner that lacks the requisite level of confidence in the reliability of its result").

Thus, for all these reasons, even if the selection process had been representative, the case law is clear the Test Plaintiffs could not bind the Non-Test

27

Plaintiffs without running afoul of the Seventh Amendment.  The District Court,

therefore, erred in extending summary judgment against all Plaintiffs.

### C.  The District Court Erred Because Extending Summary Judgment to the Non-Test Plaintiffs Improperly Extended the Doctrines of Claim and Issue Preclusion

The District Court also erred because, as the Third Circuit has held, "[t]he

District Court's extension of the Trial Plaintiffs' summary judgment decision to the

Non-Trial Plaintiffs would also improperly extend the doctrine of collateral

estoppel/issue preclusion."  *TMI*, 151 F.3d at 726; *see also Dodge*, 203 F.3d at

1199 (holding collateral estoppel did not bar re-litigation of common negligence

issues based on the jury verdict of bellwether plaintiffs where the parties were not

"on notice the first jury would decide the issue of negligence as a matter of law for

all succeeding trials"); *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d

941, 952 (3d Cir. 1990), *disapproved of on other grounds by Daubert*, 509 U.S. at

585 (rejecting argument that a group of consolidated cases should be dismissed

because of positive outcomes for the defendants in related cases because court did

"not have the authority to create special rules to address the problems posed by

[mass tort] litigation" and "[p]rinciples of issue preclusion have not developed to

the point where [the court] may bind plaintiffs by the finding of previous

proceedings in which they were not parties").

It is a fundamental rule that individuals cannot be bound by judgments or determinations of issues in litigation to which they are not parties.  *See Taylor v. Sturgell*, 553 U.S. 880, 884 & 892-93 (2008); *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2379 (2011). [12]  *Taylor* recognized six limited exceptions to this rule allowing for non-party preclusion.  553 U.S. at 893-95.  Individuals will be bound to a judgment (1) when they have expressly agreed to be bound; (2) when there is a pre-existing substantive legal relationship, such as preceding and succeeding owners of property; (3) when, "in limited circumstances," the individual is adequately represented, such as in class actions; (4) when the individual controlled the previous litigation; (5) when an individual brings suit as a designated representative of a previous party; and (6) when a statutory scheme, such as in bankruptcy, precludes re-litigation.[13]  *Id.*

---

[12] As *Taylor* instructed, claim preclusion and issue preclusion (also known as collateral estoppel) are collectively referred to as "res judicata."  553 U.S. at 892 & *n.*5.  Under claim preclusion "a final judgment forecloses 'successive litigation of the very same claim'" and issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved' . . . even if the issue recurs in the context of a different claim."  *Id.*  (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748–49 (2001)).

[13] The elements of issue preclusion are: "'(1) the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case; and (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination.'"  *United States v. Hoover–Hankerson*, 511 F.3d 164, 171 (D.C. Cir. 2007) (quoting *Martin v. DOJ,* 488 F.3d 446, 454 (D.C. Cir. 2007)).  The elements for claim preclusion are similar, but not identical, and a subsequent lawsuit is barred

Of the exceptions endorsed by the Supreme Court in *Taylor*, none is applicable in the circumstances of this case.  First, the record is clear the Non-Test Plaintiffs did not agree to be bound by the Test Plaintiffs or any final determination concerning their claims.  *See supra* Section II.A.1.  Second, the Non-Test Plaintiffs did not have a qualifying substantive legal relationship with the Test Plaintiffs.  *Id.* Third, the Non-Test Plaintiffs were not adequately represented in this non-class action, as they had no opportunity to present evidence in opposition to summary judgments directed at the Test Plaintiffs.  *Id.*  Fourth, the Non-Test Plaintiffs did not control the litigation.  *Id.*  Fifth, the Non-Test Plaintiffs are not designated representatives serving as proxies of the Test Plaintiffs; and sixth, there is no statute precluding litigation of their claims or any issues.  *See Taylor*, 553 U.S. at 895.  In short, the circumstances of this case do not satisfy any of the exceptions to the general rule against non-party preclusion articulated in *Taylor*.  553 U.S. at 893-95.  *Cf. Abbe v. v. City of San Diego, Cal.*, 444 F. App'x 189, 189-90 (9th Cir.

---

where prior litigation: "(1) involve[es] the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdictio *n*."  *Smalls v. United States,* 471 F.3d 186, 192 (D.C. Cir. 2006).  While the underlying analysis for issue preclusion and claim preclusion vary slightly, the analysis for their application to a nonparty is the same.  *See Smith*, 131 S.Ct. at 2379 (analyzing exceptions recognized in *Taylor*, a claim preclusion case, in the context of issue preclusion).  Additionally, whether claim or issue preclusion, the nonparty must have had a "full and fair opportunity to litigate" the issue or claim in the earlier lawsuit.  *See Taylor*, 553 U.S. at 892.

2011) (upholding district court's application of "issue preclusion to enter judgment against all remaining plaintiffs after the trial of the eight test plaintiffs" because "the plaintiffs' agreement to be bound by the liability issues decided at trial established their privity with the test plaintiffs . . . and the plaintiffs' prior representations established the identity of the relevant issues").

By extending the summary judgment entered against the Test Plaintiffs to the Non-Test Plaintiffs, without addressing the requirements of issue or claim preclusion, the District Court failed to give the Non-Test Plaintiffs a full and fair opportunity to litigate the issues common to their individual claims and, in doing so, violated the limited doctrine of res judicata.  *See Taylor*, 553 U.S. at 884 & 892-93; *Smith*, 131 S. Ct. at 2379; *see also In re Methyl Tertiary Butyl Ether (MTBE) Products*, 1:00-1898, 2007 WL 1791258, at *4 & *n.*21 (S.D.N.Y. June 15, 2007) (holding that "[t]he verdict reached in this[bellwether] trial will only bind the parties who participate in the trial and then only if a verdict is reached as to that party" because "collateral estoppel as to those defendants is appropriate," as they "will have had a full and fair opportunity to litigate those issues").

As the Tenth Circuit noted in analyzing the issue preclusive effect of a bellwether trial on the parties outside of the bellwether group:

> *TMI* must remind us to focus on what was actually litigated and who should be bound and benefit from those results.  That concern must override arguments about inconsistent results and time-consuming relitigation of the same issue.  If the parties intended to bind

subsequent litigation with the results of prior test trials, the record
must clearly memorialize that agreement.  Their failure to do that here
leaves important substantive rights at the mercy of trial tactics.

*Dodge*, 203 F.3d at 1200.

With no agreement demonstrating the Test Plaintiffs were adequately

representing their claims, and in the absence of the Non-Test Plaintiffs'

participation in the summary judgment proceedings, the District Court's failure to

ensure the Non-Test Plaintiffs' interests were adequately represented is fatal and

impermissibly expanded the scope of claim and issue preclusion.  *TMI*, 151 F.3d at

726.

### D.     The District Court Erred Because the Non-Test Plaintiffs Did Not Receive Notice Their Claims Could Be Dismissed

The District Court's grant of summary judgment against all Plaintiffs and

not just the Test Plaintiffs is additionally erroneous because the Court failed to

provide notice to the non-Test Plaintiffs before dismissing their claims, as required

by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56(f) (requiring courts

give the parties "notice and a reasonable time to respond" before granting

summary judgment on different grounds than those requested or granting summary

judgment *sua sponte*).  In this case, the District Court's grant of summary

judgment against all Plaintiffs, when Defendants only moved for summary

judgment against the Test Plaintiffs, amounts to either a *sua sponte* grant of

summary judgment as to the non-Test Plaintiffs or, alternatively, a grant of

32

summary judgment on different grounds than those requested.  Either way, the District Court was required to provide the Non-Test Plaintiffs with notice and a reasonable time to respond before it dismissed them.  *See, e.g., Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 628 (11th Cir. 2004) (reversing a district court's extension of summary judgment to non-test plaintiffs because notice was not "explicitly given to *all* litigants") (emphasis in original).

In *Hogan*, a case strikingly similar to this case, although the defendant's motion for summary judgment "only referred to the test plaintiffs, the district court, . . . grant[ed] summary judgment in favor of [defendant], [and] denied all pending motions as moot and directed the clerk to close the file."  *Id.*  "Upon a request for clarification by plaintiffs in their Motion for Reconsideration, the district court stated that all plaintiffs were affected by the summary judgment order—not just the test plaintiffs."  *Id.*  The district court reasoned that "because plaintiffs said they were similarly-situated and each plaintiff signed a Consent-to-Join form agreeing to be bound by any adjudication of the court, all plaintiffs were bound by the summary judgment order."  *Id.*

The Eleventh Circuit vacated and remanded as to the non-Test Plaintiffs because they did not receive notice pursuant to Rule 56(c).[14]  The Court held the

---

[14] Prior to 2010, when the Federal Rules were amended, Rule 56(c) required "a minimum 10-day notice before the hearing so that the parties have the opportunity

notice provisions of Rule 56 are an "important safeguard" that must be "strictly enforced . . . because of the big consequence of a case being disposed of at the summary judgment stage: it is a final adjudication on the merits." *Id.* Thus, even where non-test plaintiffs have indicated their intent to be bound by test plaintiffs, notice must still be explicitly given to *all* litigants before entering summary judgment in order to ensure all parties to have the opportunity to present evidence in support of their position. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (courts "possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence").

In this case, like in *Hogan*, although DynCorp moved for summary judgment only on the Test Plaintiffs' claims, *see supra* Section II.A.2, the District Court granted summary judgment against all Plaintiffs, denied as moot all other pending motions, and indicated the grant of summary judgment was a final appealable order. APP-01209-01210. The Non-Test Plaintiffs were not on notice that the Court was even considering the dismissal of their claims. *See supra* Section II.A. Indeed, even more egregious than in *Hogan*, the Non-Test Plaintiffs here had never stipulated to be bound or represented by the Test Plaintiffs; DynCorp's motions for summary judgment only sought dismissal of the Test Plaintiffs' claims, and the

---

to present to the court the best case they have in support of their positio *n.*"
*Hogan*, 361 F.3d at 628.

SEALED MATERIAL REDACTED

District Court had otherwise made clear the Test Plaintiffs were proceeding for *informational* purposes. *See supra* Section II.A.  It was, therefore, error for the District Court to enter summary judgment against the Non-Test Plaintiffs without providing them notice and a reasonable time to respond and present evidence. *See* Fed. R. Civ. P. 56(f); *Hogan*, 361 F.3d at 628; *Celotex*, 477 U.S. at 326.

## III.  THE DISTRICT COURT ERRED IN REQUIRING A GENERAL CAUSATION EXPERT FOR PLAINTIFFS' CROP DAMAGE CLAIMS

The District Court erred in two ways when it held that Plaintiffs' crop damage claims require a general causation expert.  APP-01220-01221.  First, the harmful effect of glyphosate on crops is undisputed; DynCorp and Plaintiffs, the scientific community, and the ███████████████████████ all agree that glyphosate kills crops.[15]  Glyphosate's designed purpose and uncontested ability to damage crops obviates the need to provide expert testimony about whether "the toxicant in question is capable of causing the injury complained of (general causation)."  APP-01218 (District Court order, quoting *Young v. Burton*, 567 F. Supp. 2d 121, 138 (D.D.C. 2008)).  Second, even if anyone disputed glyphosate's ability to cause crop damage, the jury could determine that glyphosate is "capable of causing"

---

[15] The differences between glyphosate alone and the Plan Colombia aerial chemical spray mix (which contained more than glyphosate) are not relevant to the issues on appeal, so Plaintiffs will use "glyphosate" to refer both to glyphosate alone and to the Plan Colombia aerial chemical spray mix containing glyphosate.

SEALED MATERIAL REDACTED

Plaintiffs' crop damages without expert testimony by relying on "their own common sense and general experience."  APP-01218-01219.[16]

### A.    Plaintiffs Did Not Need a General Causation Expert for Their Crop Damage Claims Because Glyphosate Is Indisputably Capable of Damaging Crops

The District Court erred in requiring a general causation expert for Plaintiffs' crop damage claims, despite a consensus that glyphosate is capable of causing damage to the types of crops grown by Plaintiffs.  DynCorp conceded that "it is certainly true that the Plan Colombia herbicide would be toxic to most plants at sufficient application rates."  APP-00870.  Ample evidence of glyphosate's effects on crops forced that concession.  For instance, one glyphosate label states:



APP-01536; *see also id.*

APP-01501.

APP-01295-01296.

---

[16] As indicated in Section II, *supra*, the District Court also erred in extending summary judgment on crop damage claims to the Non-Test Plaintiffs without any analysis.  The other grounds for reversal in this part (Section III) apply to all Plaintiffs.

SEALED MATERIAL REDACTED

███████████████████████████████████

████████████████████████  APP-01501-01502.

Federal court decisions confirm the consensus that glyphosate is capable of killing crops. *See Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1764-65 (2013) (acknowledging glyphosate kills crops not genetically modified to resist glyphosate); *Monsanto Co. v. David*, 516 F.3d 1009, 1011 (Fed. Cir. 2008) ("Herbicides that have glyphosate as the active ingredient are non-selective; that is, they kill all types of plants whether the plant is a weed or a crop."); *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1338 (Fed. Cir. 2004) ("ROUNDUP® contains glyphosate, a chemical that indiscriminately kills vegetation").

Although the District Court's reasoning was sparse, it ruled that plaintiffs must produce a general causation expert in *all* so-called "toxic tort" cases. APP-01218; APP-01220-01221. The District Court erred in extending an expert requirement to cases, like this one, involving no dispute as to the toxin's harmful potential. General causation experts are unnecessary, for example, in many asbestos cases because the harmful effects of asbestos are undisputed. *See* T. Willging, *Trends in Asbestos Litigation xi* (Federal Judicial Center 1987) ("The capacity of asbestos fibers, unlike many other toxic substances, to cause injuries, including rare forms of cancer, is undisputed."); *see also Diaz v. Edgar*, 831 F. Supp. 621, 624 (N.D. Ill. 1993) ("The capacity of asbestos fibers to cause serious

37

injuries is undisputed.").  Under the District Court's approach, asbestos plaintiffs would have to retain an expert opining that asbestos exposure can cause asbestosis. Fortunately, the law does not require plaintiffs to go through the needless exercise of hiring experts to provide opinions on undisputed issues.  The District Court therefore erred in requiring Plaintiffs to do so.

### B.    Even If Glyphosate's Effects on Crops Were Disputed, the Jury Would Not Need Expert Testimony to Decide Whether Glyphosate Can Cause Crop Damages

The District Court also erred by purporting to create a blanket rule in which all toxic tort cases require a general causation expert.  APP-01220 ("Certainly, whether a toxin can cause the kinds of injuries the plaintiffs allege is a question 'distinctly related to some science' that requires expert testimony.").  Under D.C. law, courts must make case-by-case determinations concerning expert requirements, rather than assuming experts are always necessary for certain types of cases.  *Davis v. Bud and Papa, Inc.*, 885 F. Supp. 2d 85, 89 (D.D.C. 2012) ("[C]ourts should determine whether expert testimony is required on a case-by-case basis.").  For example, in medical malpractice cases, where "expert testimony is usually required," it is unnecessary "where the proof is so obvious as to lie within the ken of the average lay juror."  *Washington v. Washington Hosp. Center*, 579 A.2d 177, 181 (D.C. 1990); *see also O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982) (expert testimony not necessary in legal malpractice actions where

38

"the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge").

Here, the average juror will have no problem determining whether a chemical designed to kill plants is capable of doing just that. Even if a general causation expert is required in more complex chemical exposure cases, such as one involving a new chemical with unknown health effects, this Court has indicated that the deciding factor is the complexity of the particular facts at issue, not the general category of the case. *See Morgan v. D.C.*, 824 F.2d 1049, 1061-63 (D.C. Cir. 1987). In that prison fight case, the defendant argued "that the testimony of a prison expert is necessary in every case alleging failure to reasonably protect an inmate from harm." *Id.* at 1061. The Court acknowledged that "special knowledge and experience [are] demanded in making prison security arrangements," but noted "there are many instances where the facts alone can prove unreasonableness and where it is unnecessary to have the opinions of experts in prison administration." *Id.* at 1062. In rejecting the need for an expert, the Court dismissed "[f]ears that a lay jury will be unable to assess the adequacy of such gross, obvious facts." *Id.*

Consistent with *Morgan*, this Court should look beyond any labeling of this case as a "toxic tort," which the District Court erroneously failed to do. *See Davis*, 885 F. Supp. 2d at 85 ("[C]ourts deciding whether to require expert testimony have

39

carefully avoided the imposition of blanket rules, instead being mindful that each case must turn on its facts."); *see id.* at 89 ("it would be legal error to conclude that expert testimony is *always* required" in public safety cases) (emphasis in original). Stripped of its label's mystique, the issue of general causation is well within a jury's grasp here. The jury need only decide whether a plant-killer could kill plants. The jury is well equipped to make that decision, especially considering D.C. courts "traditionally trust juries to make far more complex evaluations without the interposition of experts." *Morgan*, 824 F.2d at 1062; *see also Jimenez v. Hawk*, 683 A.2d 457, 462-63 (D.C. 1996) (reversing trial court's imposition of an expert requirement and holding that the jury "surely could use its common sense and everyday experience" to find that failure to seal an abandoned oil storage tank caused welder's burn injuries).

Instead of relying on *Morgan*, *Jimenez*, and other controlling D.C. authority, the District Court relied on out-of-circuit case law for its bright-line rule that toxic tort cases always require general causation experts. APP-01220. The principal case it relied on, *Wills v. Amerada Hess. Corp.*, involved the question of whether benzene and other toxins caused cancer. 379 F.3d 32 (2d Cir. 2004). The Second Circuit held that "the causal link between exposure to toxins and other behavior and squamous cell carcinoma is sufficiently beyond the knowledge of the lay juror that expert testimony is required." *Id.* at 46. *Wills*, however, acknowledged that

40

expert testimony is not always required by discussing a case where "no expert testimony was necessary to establish the causal nexus between inhaling paint fumes and the dizziness that allegedly led to plaintiff's fall." *Id.* (discussing *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54 (2d Cir. 1996)).

Plaintiffs' crop damage claims and the issue of whether glyphosate can harm crops are even simpler than the personal injury issue in *Ulfik*, putting this well within the range of cases not requiring expert testimony. *See Ulfik*, 77 F.3d at 59-60 (holding that "the trier of fact could reasonably determine, without expert testimony, that prolonged exposure to paint fumes would cause headache, nausea, and dizziness"); *see also Jimenez*, 683 A.2d at 462-63 (reversing imposition of expert requirement in case involving burn injuries stemming from abandoned oil storage tank); *Bostic v. Henkels and McCoy, Inc.*, 748 A.2d 421, 425-26 (D.C. 2000) (reversing directed verdict and holding that expert testimony was not required in case involving sidewalk safety); *D.C. v. Shannon*, 696 A.2d 1359, 1365-66 (D.C. 1997) (not requiring expert in case involving dangerous playground equipment).

Accordingly, the District Court erred in dismissing Plaintiffs' crop damage claims for not producing a general causation expert.

41

## IV. THE DISTRICT COURT ERRED IN DISMISSING CAUSES OF ACTION NOT REQUIRING EXPERT TESTIMONY ON CAUSATION

Even if the District Court correctly ruled that some of Plaintiffs' causes of action require a general causation expert, it erred by failing to analyze the elements of each cause of action individually.[17]  Some of Plaintiffs' claims do not require any expert opinion regarding general causation.  Federal courts regularly recognize that elements missing for one cause of action are not fatal to other causes of actions not sharing those elements.  *See*, *e.g.*, *Davis*, 885 F. Supp. 2d at 90; *In re NBW Commercial Paper Litig.*, 813 F. Supp. 7, 20 (D.D.C. 1992) ("[L]oss causation is not an element of the prima facie case under § 12(1); thus, absence of proof on this element is irrelevant."); *Frierson v. SBC Global Servs., Inc.*, No. 11–1300–CV–W–ODS, 2013 WL 796559, at *3 (W.D. Mo. March 4, 2013) ("The Court will separately analyze each claim because each requires different standards."); *Bottoni v. Sallie Mae, Inc.*, No. C 10–03602, 2011 WL 2293226, at *3 (N.D. Cal. June 8, 2011) (recognizing that a district court "must analyze the sufficiency of the claims individually").

*Davis* illustrates the District Court's error.  There, the "defendant argue[d] that the plaintiff cannot succeed on her assault, battery, or IIED [intentional

---

[17] As indicated in Section II, *supra*, the District Court also erred in extending summary judgment on all claims to the Non-Test Plaintiffs without any analysis. The other grounds for reversal in this part (Section IV) apply to all Plaintiffs.

infliction of emotion distress] claims because expert testimony is required to prove the relevant 'standard of care.'"  885 F. Supp. 2d at 90.  In rejecting that argument, the court noted that the defendant "overlook[ed] the differences between the elements of the plaintiff's various claims" and explained that, "[w]hile the 'standard of care' is an element of a negligence claim, it is not an element of a claim for assault, battery, or IIED."  *Id.*  Similarly, the District Court here assumed that a general causation expert was required for all of Plaintiffs' claims.  Yet such an expert is irrelevant to Plaintiffs' claims for battery, trespass, nuisance, and emotional distress.

Battery requires a showing of "harmful or offensive contact," *Person v. Children's Hosp. Nat. Med. Ctr.*, 562 A.2d 648, 650 (D.C. 1989), but not actual physical injury from glyphosate exposure that might require expert testimony.  The "essence" of a battery claim "consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done to his body."  Restatement (Second) of Torts § 18, comment c.  Actionable contact thus must be "offensive to a reasonable sense of personal dignity" but need not cause "substantial or tangible bodily harm."  *Id.*, comment g; *see also Person*, 562 A.2d at 650 (plaintiff's testimony that security guards "led him out of the building raises at least a jury question  . . . whether the contact itself was offensive and thus a battery"); *Barnette v. Grizzly Processing,*

*LLC*, 809 F. Supp. 2d 636, 647-48 (E.D. Ky. 2011) (allowing battery claim to proceed in coal dust case and noting that battery "is an offense against the dignity of the plaintiff, [so] neither physical injury nor actual damage must be proved by the plaintiff"). Accordingly, a general causation expert is irrelevant to battery claims premised on offenses to dignity, as a jury is well equipped to determine what offends a reasonable sense of personal dignity.

Like the coal dust case, *Barnette*, an example from the Restatement conclusively demonstrates that Plaintiffs' battery claims are actionable. *See* Restatement (Second) of Torts § 18, comment g ("A throws dirty water from his window at B who is walking on a street below. A few drops fall on B's hand but do him no bodily harm. A is subject to liability to B."). And any doubts about whether Plaintiffs' contact with glyphosate was offensive should be resolved by the jury, not the court. *See Evans v. Washington Ctr. for Internships and Academic Seminars*, 587 F. Supp. 2d 148, 150-51 (D.D.C. 2008) (denying motion to dismiss in part because "defendants' argument that the contact could not possibly be construed as harmful or offensive . . . is also a factual question").

Similarly, for claims of trespass, "it is not necessary to prove actual damage." *Day v. Avery*, 548 F.2d 1018, 1029 *n.*52 (D.C. Cir. 1976). Rather, "[t]respass is actionable per se." *Id.*; *see also Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 345 (D.D.C.

44

2011) ("District of Columbia law allows a plaintiff to recover nominal damages for

trespass.  Therefore, even assuming . . . that Plaintiffs could not recover actual

damages, that still would not be fatal to their claim.") (internal citation omitted).

Accordingly, Plaintiffs' trespass claims, at least to the extent they do not seek

actual damages, may proceed without a general causation expert.

Private nuisance claims not based on glyphosate's physical effects also do

not require a general causation expert.  A private nuisance is "a substantial and

unreasonable interference with private use and enjoyment of one's land—for

example, by interfering with the physical condition of the land, disturbing the

comfort of its occupants, or threatening future injury or disturbance."  *B & W*

*Management, Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 882 (D.C. 1982) (internal

citations omitted).  Courts have long recognized low flying planes may be

actionable nuisances.  *See Brandes v. Mitterling*, 196 P.2d 464, 468 (Ariz. 1948)

("extensive low flying, causing unreasonable annoyance to occupants of land

below, is a substantial interference with enjoyment of the property"); *Aviation*

*Cadet Museum, Inc. v. Hammer*, 283 S.W.3d 198, 202-06 (Ark. 2008) (finding that

low flying planes constituted a nuisance).  Accordingly, some of Plaintiffs' private

nuisance damages, including those based on their fear of the spray planes flying

over their farms, require no expert testimony.  In addition, Plaintiffs could go

forward on their public nuisance claim based on their emotional distress injuries.

*See Openshaw v. Consol. Eng'g Servs., Inc.*, No. 06–1884 (CKK), 2007 WL 1087482, at *4 (D.D.C. Apr. 10, 2007) (holding that plaintiffs sufficiently alleged that they had "suffered special damage—including physical, *emotional*, and economic injury—distinct from that common to the public") (emphasis added).

Finally, emotional distress claims do not require a general causation expert to opine about glyphosate's health effects. Rather, for their negligent infliction of emotional distress (NIED) claim, Plaintiffs must show that they feared for their physical safety. *See Sowell v. Hyatt Corp.*, 623 A.2d 1221, 1225-26 (D.C. 1993) ("Fear of contaminated food hitting one's stomach is, like fear of being hit by a truck, a fear for one's physical safety."). And "[t]he seriousness of the harm feared is, of course, a matter to be addressed in evaluating damages and is not the court's function on summary judgment." *Id.* at 1226. Physical injury, however, is not an element of NIED, making a glyphosate expert unnecessary. *Id.* at 1225 ("[A] plaintiff may recover in the absence of a physical injury if the emotional harm is 'serious' and 'verifiable.'"). The same is true for IIED. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810 *n.*35 (D.C. 2011) ("[T]he plaintiff alleging [IIED] does not have to show that there was a threat of physical injury or actual physical injury."). Rather than physical injury, severe emotional distress is an element of an IIED claim, but it requires no expert. *See Adams v. Vertex, Inc.*, No. 04-01026 (HHK), 2007 WL 1020788, at *4 *n.*7 (D.D.C. March 29, 2007) ("A

46

plaintiff, however, need not see a psychiatrist, psychologist, or other mental health

expert in order to prove 'severe emotional distress.'").

Accordingly, Plaintiffs' claims for battery, trespass, nuisance, and emotional

distress do not need a general causation expert and the District Court erred in

holding otherwise.

## V.    THE DISTRICT COURT ERRED IN DISMISSING THE PROVINCES FOR LACK OF STANDING

The District Court erred in ruling that the Provinces lack Article III standing.

APP-00648-00649.  The Provinces amply demonstrated injuries that are fairly

traceable to DynCorp's spraying.  *See Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-61 (1992) (holding that the three elements for constitutional standing are:

(1) an injury-in-fact that (2) is fairly traceable to the defendant's conduct and that

(3) is likely to be redressed by the requested relief).[18]

The Provinces alleged injuries sufficient for Article III standing, including

economic damages.  APP-00258, ¶ 7; APP-00263, ¶ 32; *see also* APP-00655

(District Court describing "three categor[ies] of harms" alleged by the Provinces).

The Provinces amply supported their allegations with factual submissions.  *See*

APP-00536-00542 (report by Henry H. Fishkind, Ph.D. estimating, for example,

damages of $398,847 incurred by the Province of Sucumbíos for direct monetary

_____

[18] The District Court did not hold, let alone suggest, that Plaintiffs did not meet the
redressability prong, so Plaintiffs will not discuss that prong of the standing test.

damages flowing from reduced revenues and increased costs); APP-00584 (Sucumbíos interrogatory response stating that it "had to invest in 132 schools . . . which provide educational services to displaced persons"); APP-00590 (Carchi interrogatory response stating that it "had to invest in health centers in the communities along the border, for it is there in that zone where there has been an increase in cases requiring medical attention, especially by children and infants"); APP-00600 (Esmeraldas interrogatory response stating that "[t]wo medical brigades have been conducted in the affected zone of [Esmeraldas] for an amount of [$30,000]").

The District Court seemingly questioned the Provinces' injuries, asserting "there is no factual basis to support a conclusion that these costs will be borne by the provinces as opposed to [others]."[19]  APP-00661.  The District Court's assertion that the Provinces would not bear costs, however, was plainly erroneous given that the Provinces provided information on costs they had *already* incurred. *See*, *e.g.*, APP-00584 (Sucumbíos interrogatory response); APP-00590 (Carchi interrogatory response); APP-00600 (Esmeraldas interrogatory response). Moreover, DynCorp's expert on Ecuadorian law even admitted that the Provinces could spend funds on public projects.  APP-00610 at 27:6 to 30:4; *see also* Law on

---

[19] The District Court found that other injuries (the budget deficits) were sufficiently alleged.  APP-00655-00656.  It ruled, however, that causation was lacking for those damages.  APP-00656.  The Provinces demonstrate below why the District Court's causation analysis was flawed.

48

the Provincial Regime (Ecuador), Art. 7(c), (g)-(h) (enumerating the powers of the provincial councils, which include the powers to "[u]ndertake public works," "create schools," and "protect the sanitary state of the province").[20]  And, as the District Court observed, "[m]onetary damages may constitute an injury-in-fact to satisfy the first prong of the standing analysis."  APP-00655.

Furthermore, contrary to the District Court's assertion, none of the damages sought by the Provinces are "third-party, derivative claims."  APP-00661.  The District Court misunderstood the Provinces' claims when focusing on individuals' "respiratory and digestive problems."  *Id.*  The Provinces are not seeking damages based on personal injuries to their residents; they are seeking independent damages, such as government expenditures on education and health care.  APP-00584; APP-00590; APP-00600 (interrogatory responses).

The District Court also applied a flawed causation analysis.  The Provinces' injuries, as described above, are closely linked—and thus fairly traceable—to DynCorp's spraying.  For example, Esmeraldas conducted medical brigades, built new schools, and even partially relocated a community because of the spraying.  APP-00600; APP-00601.  Despite the clear-cut links between the Provinces' injuries and DynCorp's spraying, the District Court rejected the Provinces'

---

[20] This is a translation of a law originally in Spanish that was in effect in Ecuador from March 20, 2001 to October 19, 2010.

showing.  APP-00655- 00657; APP-00660- 00661.  In doing so, the District Court erred in three ways.

First, the District Court appeared to rely on a series of cases, including several state court cases, which purportedly used "the proximate cause standard" in determining standing.  APP-00653-00655.  Equating proximate cause with standing's fairly traceable requirement, however, is contrary to established federal law.  *See Tozzi v. U.S. Dept. of Health and Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) ("[W]e have never applied a 'tort' standard of causation to the question of traceability."); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("no authority even remotely suggests that proximate causation applies to the doctrine of [Article III] standing").  Because proximate cause is more demanding than the fairly traceable standard, it cannot be applied in the Article III standing context.  *See Focus on the Family*, 344 F.3d at 1273 ("[I]n evaluating Article III's causation (or 'traceability') requirement, we are concerned with something less than the concept of 'proximate cause.'").

Second, the District Court erred in focusing on other potential causal factors. APP-00656 (discussing "other . . . factors" and "unknown factors").  Even at trial, the Provinces will not have to prove that DynCorp's spraying was the sole cause of their injuries.  *See D.C. v. Zukerberg*, 880 A.2d 276, 283 (D.C. 2005) (holding that "plaintiff was not required to show that the negligent condition of the diving board

50

was the only possible cause of the fall"); *Estate of Kurstin v. Lordan*, 25 A.3d 54, 69 (D.C. 2011) ("More than one person can be a legal or proximate cause of an injury, provided that the individual's action is a substantial factor in bringing about the injurious result.").  Multiple causes do not preclude liability at trial under the more rigorous proximate cause standard, so they certainly do not foreclose the conclusion that one of several potential causes is fairly traceable to the injury for standing purposes.

Third, the District Court erred to the extent it required direct causation. APP-00656-00657; APP-00661 (requiring "a direct or otherwise non-attenuated injury"); *but see* APP-00652-00653 (refusing to rely on certain directness cases cited by DynCorp).  Directness is part of the proximate cause standard, not the fairly traceable standard.  *Compare Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (discussing how proximate cause, an additional requirement for statutory standing in RICO cases, requires a "direct relation between the injury asserted and the injurious conduct alleged") *to Focus on the Family*, 344 F.3d at 1273 ("even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes").  Whether the spraying directly caused the Provinces' injuries is thus irrelevant for standing purposes.

In summary, the Provinces demonstrated injuries that are fairly traceable to DynCorp's spraying, thus establishing standing.

51

## VI.  THE DISTRICT COURT ERRED IN DISMISSING 163 PLAINTIFFS FOR PURPORTEDLY INCOMPLETE QUESTIONNAIRE RESPONSES

The District Court erred in two ways in dismissing 163 Plaintiffs for purportedly incomplete questionnaire responses.  APP-00520.[21]  First, dismissal with prejudice was too harsh of a sanction and second, the District Court misapplied its own standard as to what were sufficient questionnaire responses.

"[I]n the context of litigation-ending sanctions," this Court has "insisted" that "dismissal is a sanction of last resort to be applied only after less dire alternatives have been explored without success or would obviously prove futile." *Bonds v. D.C.*, 93 F.3d 801, 808 (D.C. Cir. 1996) (internal quotations omitted).  Also, any sanction must be "proportionate to the nature of the [offending party's] discovery violation and its effects on the litigation."  *Id.* at 809.  Punishing 163 Plaintiffs with dismissal with prejudice for producing (at worst) partially complete questionnaires is disproportionately harsh and cannot be squared with *Bonds*.  *Id.* at 804-06 & 810-13 (rejecting as "overly harsh" a witness preclusion sanction even though defendant exhibited "contumacious conduct," was admonished for understaffing the case, missed interrogatory response deadline despite sanction warning, and produced insufficient response after deadline).

---

[21] Although the order applies to 165 Plaintiffs, Plaintiffs only opposed dismissal of (and only appeal on behalf of) 163 of them.  APP-00521; *Arias* Doc. No. 152 at 6 *n.*3.

If anything, the District Court should have imposed a lesser sanction here. The District Court acknowledged that it "must consider whether a lesser sanction 'would be more appropriate'" and that dismissal is only appropriate "'after less dire alternatives have been explored without success.'" APP-00515-00516 (quoting *Bonds*, 93 F.3d at 808 and *Trakas v. Quality Brands, Inc.*, 759 F.2d 185, 186-87 (D.C. Cir. 1985)). It then abdicated its responsibility to explore lesser sanctions, improperly shifting the burden to Plaintiffs by claiming that they failed to show "that a lesser sanction would be effective here." APP-00519; *see also Bonds*, 93 F.3d at 808 (holding that Rule 37 "requires in cases involving severe sanctions that the district court consider whether lesser sanctions would be more appropriate for the particular violation"). Moreover, the District Court's conclusory finding that "no lesser sanction is appropriate," APP-00520, was insufficient as a matter of law. *Webb v. D.C.*, 146 F.3d 964, 972 (D.C. Cir. 1998) ("Conclusory statements are not enough."). In short, the District Court neither gave adequate consideration to lesser sanctions, nor offered a reasoned analysis for rejecting lesser sanctions, thus ignoring this Court's prerequisites for imposing a dismissal sanction. *See Bonds*, 93 F.3d at 808-09.

Furthermore, the District Court's reasons for imposing the sanction were unsupported by the record. The District Court offered no explanation why the purportedly incomplete questionnaire responses of these Non-Test Plaintiffs

53

"impede[] the defendants' ability to prepare their defense," APP-00518,

particularly where the District Court implemented a Test Plaintiff approach in

which it placed the cases of just twenty Plaintiffs on the first trial track, and where

DynCorp had no role in selecting the Test Plaintiffs.[22]  Next, the District Court's

finding that Plaintiffs "violate[d]" and "disregarded" court orders, APP-00520,

overlooks the fact that all of the Plaintiffs at issue did indeed at least partially

complete, sign, and produce the 42-page questionnaire at issue.  *See*, *e.g.*, APP-

00492; APP-00495.  For all of these reasons, the sanction of dismissal with

prejudice was an abuse of discretion.

The District Court also erred by applying a different standard than it

previously established for determining the sufficiency of questionnaire responses

for damages identification and exposure location.  Doing so was fundamentally

unfair, and violated the law of the case doctrine.  *See Pepper v. U.S.*, 131 S. Ct.

---

[22] Prior to dismissal, the parties repeatedly indicated that the questionnaires were primarily intended to assist an informed selection of the Test Plaintiffs.  APP-00209 at 29:16-22 (DynCorp stating the "provision of questionnaire responses [is necessary] in order for us to fairly evaluate . . . what test cases would be fair and appropriate"); APP-00386 (DynCorp claiming prejudice "because [it is] unable to make an educated selection of those test plaintiffs").  Yet the District Court ordered that Plaintiffs alone select the Test Plaintiffs on July 17, 2009, APP-00462, obviating any need for DynCorp to use the questionnaires for selection purposes. (The dismissal of the 163 Plaintiffs occurred on January 12, 2010, well after that order.)  The procedural history regarding the Test Plaintiff issue thus moots any claim that DynCorp would suffer prejudice by not being able to make an educated selection of Test Plaintiffs if all questionnaires were not fully completed.  *See also supra* Section II.A (discussing Test Plaintiff procedural history in depth).

1229, 1250 (2011) (stating that the law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case'") (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

For damages, the District Court stated that the questionnaires merely needed to provide "some identification of damage." APP-00441 at 14:20; *see also* APP-00440 at 13:15-17 (requirement would be satisfied if Plaintiffs produced "any information about what they are saying by way of damages"). Plaintiffs' burden was minimal, and did not require that they place "a dollar figure" on their damages. *Id.* at 13:18-22. Rather, the District Court indicated that a basic description of the losses would meet its standard. *See*, *e.g.*, APP-00442 at 15:3-4 (example offered by the District Court: "I had six heads of live stock that died").

Instead of applying this easy-to-meet standard, the District Court wholly ignored the issue of identifying damages in its opinion. *See generally* APP-00513-00520. If the District Court had properly considered the issue, it would have found that Plaintiffs' damages showing easily met the "any information" threshold. APP-00440 at 13:15-17. Plaintiffs' factual submission in opposition to DynCorp's motion to dismiss demonstrated that many Plaintiffs listed physical health symptoms, property damages, or both in their questionnaires. APP-00495.

For exposure location, the District Court indicated that Plaintiffs need only identify the general location of their exposure. *See* APP-00459 at 32:17-22 (stating an area the size of Georgetown is a "nice and precise identification" of exposure location and even the "10-square mile area of Washington, D.C. for an aerial spraying case might not be too bad either"). Plaintiffs met this lenient standard. *See* APP-00492. In dismissing Plaintiffs, the District Court applied a more rigorous standard than it had previously announced.

In addition, the District Court placed great weight on how some Plaintiffs used the term "the farm" rather than "my farm" to identify where their exposure occurred. APP-00518. Spanish-speakers, however, regularly use the definite article ("the") when English-speakers would use the possessive pronoun ("my"). *See* Silvina Montrul and Tania Ionin, *Transfer Effects in the Interpretation of Definite Articles by Spanish Heritage Speakers*, Bilingualism: Language and Cognition, Vol. 13, Issue 4, 449 (Oct. 2010) (noting Spanish-speakers who have not been exposed to English will often use the definite article in place of the possessive pronoun); Robert P. Stockwell, et al., *The Grammatical Structures of English and Spanish* 72 (1965) ("By Spanish standards, English overworks its possessives, and the use of a Spanish possessive where there is no doubt who the possessor is gives the effect of being strangely insistent."). Contrary to the District

Court's ruling, there is ample reason to construe the phrase "the farm" as meaning the farm belonging to the responding Plaintiff.

Both because it applied an overly harsh dismissal sanction and violated the law of the case doctrine by changing the standard for the sufficiency of questionnaire responses without any notice, the District Court erred in dismissing the 163 Plaintiffs.

## CONCLUSION

For all of the reasons above, the District Court's rulings should be reversed.

Dated: August 29, 2013

Eric Hager
CONRAD & SCHERER, LLP
Avenida República de El Salvador 500 e
Irlanda
Edificio Siglo XXI, PH Oficina W
Quito, Ecuador
Tel: 954-622-0461
Fax: 1-866-803-1125
ehager@conradscherer.com

Terrence Collingsworth
Christian Levesque
CONRAD & SCHERER, LLP
1156 15th St. NW, Suite 502
Washington, DC 20005
Tel: 202-543-4001
Fax: 1-866-803-1125
tcollingsworth@conradscherer.com
clevesque@conradscherer.com

*Counsel for Plaintiffs-Appellants*

57

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type volume limitation of 14,000 words of Fed.

R. App. P. 32(a)(7)(B)(ii), because this brief contains 13,926 words,

excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii)

and Circuit Rule 32(a)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6),

because this brief has been prepared in a proportionally spaced typeface

using Microsoft Word  2010 in 14 point Times New Roman.


Dated: August 29, 2012

Eric Hager
CONRAD & SCHERER, LLP

*Counsel for Plaintiffs-Appellants*

58

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 29, 2012, I caused the Public Redacted Appellants' Opening Brief and Appendix to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that on August 29, 2012: (1) The original and six copies of the sealed brief and the original and eight copies of the public brief; and (2) Seven copies of the sealed supplement and seven copies of the public appendix were filed in person with the Clerk of the Court. In addition, two public and sealed opening briefs, and one copy of the appendices were served via FedEx Overnight courier on the following:

Joe G. Hollingsworth
Rosemary Stewart
Eric G. Lasker
**HOLLINGSWORTH LLP**
1350 I Street, NW
Washington, D.C. 20005

*Counsel for Appellees*

Eric Hager
CONRAD & SCHERER, LLP

*Counsel for Plaintiffs-Appellants*

59