ORAL ARGUMENT NOT YET SCHEDULED
_____

Nos. 13-7044 (lead case), 13-7045
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**VENANCIO AGUASANTA ARIAS**, *et al.*,

**Plaintiffs-Appellants**

v.

**DYNCORP**, *et al.*,

**Defendants-Appellees.**
_____

**NESTOR ERMOGENES QUINTEROS**, *et al.*,

**Plaintiffs-Appellants**

v.

**DYNCORP**, *et al.*,

**Defendants-Appellees.**
_____

On Appeal from the U.S. District Court for the District of Columbia
(D.D.C. 1:01cv01908 (RWR) (*Arias*) & 1:07cv01042 (RWR) (*Quinteros*))
_____

**OPPOSITION BRIEF FOR APPELLEES**
_____

Joe G. Hollingsworth
Eric G. Lasker
Rosemary Stewart
  HOLLINGSWORTH LLP
  1350 I Street, NW
  Washington, D.C. 20005
  Phone: (202) 898-5800
  Fax: (202) 682-1639
  elasker@hollingsworthllp.com

## **CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

Pursuant to Circuit Rule 28(b)(1), counsel for Defendants-Appellees hereby certify that the parties, rulings and related cases are accurately set forth in the Plaintiffs-Appellants' opening brief, except that the Plaintiffs-Appellants have incorrectly identified the DynCorp defendants as including DynCorp Aerospace Operations LLC and DynCorp Techserv, LLC. The four DynCorp entities identified as defendants in the *Arias* complaint (and previously agreed upon by all parties as the correct entities) are DynCorp, DynCorp Aerospace Technology, DynCorp Technical Services, LLC, and DynCorp International, LLC.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ... ii

COUNTERSTATEMENT OF ISSUES ON APPEAL ................................. 1

STATEMENT OF FACTS ............................................................. 2

I.    Background of the United States/Republic of Colombia "Plan
      Colombia" Coca Eradication Operations and International Findings
      Regarding Its Safety. ........................................................... 4

II.   Plaintiffs' Failure to Substantiate Their Self-Selected, Representative
      Test Cases. ...................................................................... 8

      A.    Plaintiffs' Failure to Proffer the Expert Testimony They
            Repeatedly Promised and Acknowledged Was Necessary to
            Meet Their Burden of Proof ....................................... 10

      B.    Plaintiffs' Repeated Failures to Provide Court-Ordered
            Disclosures Setting Forth *Prima Facie* Support for Their
            Claims .................................................................... 19

      C.    The Plaintiffs' Selection of "Representative" Test Cases ....... 23

SUMMARY OF ARGUMENT .................................................... 28

ARGUMENT ......................................................................... 30

I.    The District Court Properly Held Plaintiffs to Their Burden to Proffer
      Expert Testimony In Support of Their Toxic Tort Claims. ............... 30

      A.    The District Court Correctly Granted Summary Judgment on
            Plaintiffs' Crop Damages Claims. ............................... 30

      B.    Plaintiffs Have Waived Any Claim For Non-Physical or
            Nominal Damages. ................................................... 33

II.   The District Court Properly Applied Its Summary Judgment Rulings
      to All of the Individual Plaintiffs. ........................................ 36

A.    Plaintiffs Consented to be Bound by the Court's Rulings on Their Self-Selected Test Cases. ................................................. 37

B.    Plaintiffs Are Judicially Estopped from Arguing that the Test Cases Are Not Binding on the Remaining Plaintiffs. ............. 42

C.    Plaintiffs Waived Any Argument that the District Court Misunderstood Their Position by Failing to Seek Post Judgment Relief. ...................................................................................... 46

III.    The District Court Properly Dismissed the Three Provincial Plaintiffs for Lack of Prudential and Constitutional Standing .......................... 47

A.    The Provinces' Lack of Prudential Standing Requires Dismissal of All of Their Claims. ............................................................. 49

B.    The Provinces' Alleged Damages Are Too Remote to Provide Constitutional Standing. ........................................................... 50

IV.    The District Court Acted Within Its Discretion in Dismissing 163 Individual Plaintiffs for Repeated Violations of the Court's Orders to Provide a Prima Facie Basis for Their Claims. ................................... 56

CONCLUSION ............................................................................ 63

# TABLE OF AUTHORITIES[*]

**Page(s)**

**CASES**

*Abbe v. City of San Diego, Cal.*,
    444 F. App'x 189 (9th Cir. 2011).......................................38

*Acosta Orellana v. Croplife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010).......................................36

*Adams v. United States*, 4:CV 03-49-BLW,
    2011 WL 4738528 (D. Idaho Oct. 6, 2011) ...........................39

*Adams v. United States*,
    658 F.3d 928 (9th Cir. 2011) ............................................38

*Adams v. United States*, Civ. No. 03-0049-E-BLW,
    2009 WL 2584822 (D. Idaho Aug. 8, 2009) .......................32, 33

*Alaska Sport Fishing Ass'n v. Exxon Corp.*,
    34 F.3d 769 (9th Cir. 1994) .............................................52

*Albert v. Starbucks Coffee Co.*,
    213 F. App'x 1 (D.C. Cir. 2007) .......................................60

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*,
    709 F.3d 29 (D.C. Cir. 2013)............................................48

*Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*,
    724 F.3d 243 (D.C. Cir. 2013)..........................................47

*Belhas v. Ya'alon*,
    515 F.3d 1279 (D.C. Cir. 2008)........................................34

*Berger v. Heckler*,
    771 F.2d 1556 (2d Cir. 1985) ..........................................46

*Bonds v. District of Columbia*,
    93 F.3d 801 (D.C. Cir. 1996)...........................................58

*/ Authorities upon which the Defendants-Appellees chiefly rely are marked
    with asterisks

*Burton v. Theobold,
   216 N.W.2d 299 (Iowa 1974) ............................................................ 31

Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,
   123 F. Supp. 2d 245 (D.N.J. 2000) .................................................... 54

Canyon Cnty. v. Syngenta Seeds, Inc.,
   519 F.3d 969 (9th Cir. 2008) ............................................................ 50

Cimino v. Raymark Indus., Inc.,
   151 F.3d 297 (5th Cir. 1998) ............................................................ 41

*Clifford v. UAP Distribution, Inc., No. 08-2094,
   2010 WL 55671 (C.D. Ill. Jan. 4, 2010) ........................................... 31

Conservation Force, Inc. v. Jewell, --- F.3d ---, No. 11-5316,
   2013 WL 4417452 (D.C. Cir. Aug. 20, 2013) .................................... 34

Dannhausen v. Bus. Publ'ns Audit of Circulation, Inc.,
   797 F.2d 548 (7th Cir. 1986) ............................................................ 35

District of Columbia v. Beretta U.S.A. Corp., No. Civ.A. 0428-00,
   2002 WL 31811717 (D.C. Super. Ct. Dec. 16, 2002) ........................ 55

E.I. du Pont de Nemours & Co., Inc. v. Robinson,
   923 S.W.2d 549 (Tex. 1995) ............................................................. 32

Eggar v. Burlington N. R.R. Co., No. CV 89-159-BLG-JFB,
   1991 WL 315487 (D. Mont. Dec. 18, 1991) ...................................... 25

Founding Church of Scientology of Wash., D.C., Inc. v. Webster,
   802 F.2d 1448 (D.C. Cir. 1986) .................................................. 57, 60

Ganim v. Smith & Wesson Corp.,
   780 A.2d 98 (Conn. 2001) ................................................................. 55

Graham v. Canadian Nat'l Ry. Co.,
   749 F. Supp. 1300 (D. Vt. 1990) ....................................................... 32

Grocery Mfrs. Ass'n v. E.P.A.,
   693 F.3d 169 (D.C. Cir. 2012) .......................................................... 48

*GSS Grp. Ltd. v. Nat'l Port Auth.*,
    680 F.3d 805 (D.C. Cir. 2012)........................................................47

*Gulf Power Co. v. F.C.C.*,
    669 F.3d 320 (D.C. Cir. 2012)........................................................42

*Handy v. Shaw, Bransford, Veilleux & Roth*, No. 00-2336 (CKK),
    2006 WL 3791387 (D.D.C. Dec. 22, 2006) ......................................59

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972)........................................................................53

*\*Henson v. Prue*,
    810 A.2d 912 (D.C. 2002) .............................................................35

*Hogan v. Allstate Ins. Co.*,
    210 F. Supp. 2d 1312 (M.D. Fla. 2002) ..........................................41

*Hogan v. Allstate Ins. Co.*,
    361 F.3d 621 (11th Cir. 2004) .......................................................46

*In re African-Am. Slave Descendants Litig.*,
    471 F.3d 754 (7th Cir. 2006) .........................................................51

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016 (5th Cir. 1997) .......................................................24

*In re Hanford Nuclear Reservation Litig.*,
    534 F.3d 986 (9th Cir. 2007) .........................................................25

*\*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
    460 F.3d 1217 (9th Cir. 2006) .......................................................58

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ....................................................24, 40

*In re Tobacco/Governmental Health Care Costs Litig.*,
    83 F. Supp. 2d 125 (D.D.C. 1999)..................................................54

*Indus. Dev. Bd. of Section, Ala. v. Fuqua Indus., Inc.*,
    523 F.2d 1226 (5th Cir. 1975) .......................................................35

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ....................................................................51, 57

*Jimenez v. Hawk*,
   683 A.2d 457 (D.C. 1996) ........................................................................32

*Jones v. Horne*,
   634 F.3d 588 (D.C. Cir. 2011)...................................................................47

*Kleiss v. Cassida*,
   696 N.E.2d 1271 (Ill. App. Ct. 1998) .................................................33

*Lowrey v. Glassman*,
   908 A.2d 30 (D.C. 2006) ........................................................................37

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...............................................................................56

*McConnell v. Fed. Election Comm'n*,
   540 U.S. 93 (2003)................................................................................49

*Morgan v. District of Columbia*,
   824 F.2d 1049 (D.C. Cir. 1987)................................................................32

*Moses v. Howard Univ. Hosp.*,
   606 F.3d 789 (D.C. Cir. 2010)..................................................................44

*Mwani v. Laden*, --- F. Supp. 2d ---, No. 99-125(JMF),
   2013 WL 2325166 (D.D.C. May 29, 2013) .........................................39

*Nemariam v. Fed. Democratic Republic of Eth.*,
   491 F.3d 470 (D.C. Cir. 2007).................................................................47

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)........................................................................44, 45

*Partridge v. Younghein*,
   277 N.W.2d 100 (Neb. 1979) ..................................................................33

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976)..................................................................57

*Perry v. Am. Tobacco Co.*,
  324 F.3d 845 (6th Cir. 2003) ..............................................................55

*Puerto Rico v. Bramkamp*,
  654 F.2d 212 (2d Cir. 1981) ..............................................................53

*Rice v. District of Columbia*,
  774 F. Supp. 2d 25 (D.D.C. 2011)......................................................37

*Ross v. DynCorp*,
  362 F. Supp. 2d 344 (D.D.C. 2005).....................................................37

*Sadie v. City of Cleveland*,
  718 F.3d 596 (6th Cir. 2013) ..............................................................42

*Serv. Emps. Int'l Union Health & Welfare Fund v.
  Philip Morris Inc.*,
  249 F.3d 1068 (D.C. Cir. 2001)............................48, 49, 50, 51, 52, 55

*Silbernagel v. W. Farmers Ass'n*,
  556 P.2d 1369 (Or. 1976) ...................................................................33

*Silvanch v. Celebrity Cruises, Inc.*,
  333 F.3d 355 (2d Cir. 2003) ...............................................................39

*Smith v. O'Neill*, No. Civ.A. 99-00547(ESH/DAR),
  2001 WL 950219 (D.D.C. Aug. 3, 2001).............................................60

*Smith v. Penn Tank Lines*, No. Civ. 00-220-JD,
  2001 WL 575101 (D.N.H. May 29, 2001) ...........................................33

*State of São Paulo of the Federative Republic of Braz., v. Am.
  Tobacco Co.*,
  919 A.2d 1116 (Del. 2007).................................................................50

*Taylor v. Sturgell*,
  553 U.S. 880 (2008).............................................................................38

*Ulfik v. Metro-North Commuter R.R.*,
  77 F.3d 54 (2d Cir. 1996) ...................................................................32

*United States v. British Am. Tobacco (Invs.) Ltd.*,
  387 F.3d 884 (D.C. Cir. 2004)............................................................35

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
　　429 U.S. 252 (1977)............................................................................57

*Weisberg v. Webster*,
　　749 F.2d 864 (D.C. Cir. 1984)..........................................................61

*Weisgram v. Marley Co.*,
　　528 U.S. 440 (2000)..........................................................................42

*Wood v. Neuman*,
　　979 A.2d 64 (D.C. 2009) ...................................................................36

FEDERAL RULES

Fed. R. Civ. P. 59(e) ................................................................37, 46, 47

## COUNTERSTATEMENT OF ISSUES ON APPEAL

1.    Whether (a) the District Court correctly applied its general causation summary judgment rulings to all individual plaintiffs where Plaintiffs secured the right to unilaterally select the test plaintiffs by arguing that only their selections would be representative and binding, and (b) Plaintiffs waived any appeal of the District Court's application of its rulings to all plaintiffs by failing to seek post-judgment relief.

2.    Whether the District Court correctly dismissed Plaintiffs' crop damages claims based on Plaintiffs' failure to proffer any expert testimony as to the nature or cause of the alleged crop damages.

3.    Whether Plaintiffs waived their arguments regarding purported nominal, non-physical damages by failing to raise those arguments in opposition to the summary judgment rulings on appeal.

4.    Whether (a) the District Court's unchallenged holding that the Provincial Plaintiffs lacked prudential standing precludes the Provinces' appeal and (b) the District Court separately was correct in dismissing the Provincial Plaintiffs' claims for lack of Article III standing.

5.    Whether the District Court correctly dismissed the claims of 163 individual plaintiffs who failed to comply with numerous court orders

requiring them to provide basic facts in support of their claims or face dismissal.

## STATEMENT OF FACTS

This appeal starkly illustrates the extent to which Plaintiffs were unable to substantiate their outlandish allegations of personal injuries and property damages from Plan Colombia counternarcotics crop eradication operations. Plaintiffs' allegations fly in the face of repeated safety findings made by the United States Environmental Protection Agency, the Republic of Colombia Department of Health and an expert panel for the Organization of American States. SUPP.APP-00801-09. Nonetheless, the District Court provided Plaintiffs ample opportunity to substantiate their claims over four years of active pretrial proceedings. But Plaintiffs repeatedly failed to do so, leading to a series of rulings that ultimately resolved all of the Plaintiffs' claims.

In 2009 and 2010, the District Court dismissed 1,271 of the 3,292 individual plaintiffs for multiple failures to provide court-ordered disclosures of the *prima facie* factual predicates of their claims. In 2010, the District Court dismissed the derivative claims of three Ecuadorian Provinces for lack of prudential and constitutional standing. Finally, earlier this year, the District Court dismissed the remaining individual plaintiffs' claims,

based on Plaintiffs' failure to proffer any admissible general causation expert testimony that the Plan Colombia spraying could have caused their alleged injuries and damages.

Plaintiffs repeatedly had assured the District Court that they would proffer multiple expert witnesses to prove up their claims that herbicide sprayed over illicit coca fields in Colombia had drifted into Ecuador and caused the harms they alleged. In the end, however, Plaintiffs were unable to proffer a single expert witness in support of their herbicide drift, animal deaths or crop damages claims, and they proffered only one human health expert whose causation opinions were excluded below as scientifically unreliable. On appeal, Plaintiffs make no effort to defend their personal injury or animal loss claims. They also offer no explanation for their failure to proffer expert testimony in support of their herbicide drift and crop claims. Instead, Plaintiffs ask the Court to disregard both their burden of proof and their broken promises to the District Court and allow them to proceed with their crop damage claims based solely on *res ipsa loquitur*.

Plaintiffs also convinced the District Court to allow them to unilaterally select their twenty best individual plaintiffs for test cases, arguing that this was the only approach that would produce representative claims that could be binding on the entire plaintiff population. Having failed

3

to establish general causation for their test plaintiffs, however, Plaintiffs now reverse course, and argue that the test cases they selected were not representative and should not be binding on the other plaintiffs. Plaintiffs thus ask this Court to allow them to re-try (presumably *ad infinitum*) the same general causation case they were unable to substantiate for their best and most representative plaintiffs with slate after slate of additional test plaintiffs.

## I. Background of the United States/Republic of Colombia "Plan Colombia" Coca Eradication Operations and International Findings Regarding Its Safety.

This case arises from a United States/Republic of Colombia foreign policy initiative known as "Plan Colombia." Plan Colombia was launched under the Clinton Administration and has been reauthorized annually thereafter to combat the scourge of illicit narcotics cultivation and trafficking in Colombia and the attendant financing of international terrorist organizations. DynCorp International is a contractor to the United States Department of State ("DOS") in support of Plan Colombia aerial spraying operations targeting illicit coca crops in Colombia. These spraying operations have been heralded by the United Nations Office on Drugs and Crime for causing the sharp decline in Colombian coca cultivation and

impressive reductions in the threats posed by narcoterrorists in the region. SUPP.APP-00518.

In the early 2000s, the United States government was advised of complaints that herbicide drift from the aerial eradication operations was causing personal injuries and property damages in southern Colombia and northern Ecuador. SUPP.APP-00508, 00511, 00514, 00998, 01000. There is evidence that at least some of these complaints were instigated by the narcoterrorist groups that cultivated the illicit coca crops. SUPP.APP-00372-73. Nonetheless, the U.S. Congress responded with an express provision in the annual Plan Colombia appropriations legislation, beginning in 2000 and continuing to the present, which conditioned the use of certain funds on DOS's certification to Congress that the spraying operations presented no unreasonable harm to humans or the environment.

DOS has provided the required certifications to the U.S. Congress each year. SUPP.APP-00519-700, 00801-09. These reports advised Congress of the specific chemicals being used, the methods employed to mix and handle the herbicide, the level of spray pilot experience and training, and the spray parameters set by the Colombian government. The DOS reports also summarized the extensive research and testing performed for the U.S. and Colombian governments about the safety of the herbicide both for

5

human beings and for the environment and about the minimal drift of the

herbicide spray.  For example, the reports included:

- Consultations with the U.S. Environmental Protection Agency ("EPA"), in which EPA concluded, *inter alia*, that the spraying operations did not pose significant risks to human health, to farm animals or to the environment, were being conducted consistently with the herbicide's label, and were following best management practices to minimize drift.  SUPP.APP-00521-22, 00529-31, 00611-16, 00692-95.

- A letter from the U.S. Department of Agriculture ("USDA"), in which USDA recounted its own testing and review work, which had assisted in the selection of the herbicide used in Colombia and helped assure the safety of the herbicide and of the aerial application procedures.  SUPP.APP-00584, *see also* SUPP.APP-00495-501.

- The findings of independent toxicological studies of the Plan Colombia herbicide mixture, which confirmed the safety of the herbicide spray to humans and animals.  SUPP.APP-00582, 00622-23, 01001-03.

- The results of various investigations conducted by the Colombian government in response to complaints of adverse health impacts from the aerial eradication operations, all of which concluded that the complaints were without foundation.  SUPP.APP-00548-52, 00564-68, 00626-28, 00644-46.

- The results of semi-annual verification missions conducted at randomly selected spray sites in Colombia (SUPP.APP-00548, 00624), which concluded that the "drift effects . . . were temporary in nature and small in extent, and basically consisted of partial defoliation of the canopy of very high trees."  SUPP.APP-00694; *see also* SUPP.APP-00502-04.

- The results of soil and water testing that confirmed that the herbicide spray does not persist in the environment and causes no appreciable changes in the properties of the soil.  SUPP.APP-00676-90, 00695.

In the mid-2000s, an independent expert panel assembled by the Inter-American Drug Abuse Control Commission ("CICAD") of the Organization of American States ("OAS") conducted its own science-based risk assessments of the human health and environmental effects of the Plan Colombia spraying operations.  In a series of peer-reviewed, published studies, the OAS expert panel likewise concluded that the herbicide did not pose any significant risks to humans, animals or the environment, and that off-target drift from the spraying operations was very minimal, with no likely impact on vegetation more than 50 meters from the spray swaths. SUPP.APP-00711, 00771-72, 00794-95, 00799.

The spray planes that conduct the coca eradication operations (all owned by either the U.S. or Colombian government) are equipped with GPS-systems that record the location of herbicide spraying.  The spray line data generated from the GPS equipment – which was produced to Plaintiffs during discovery – demonstrates that no herbicide was ever sprayed over the farms of any Ecuadorian citizens.  SUPP.APP-00812-16, 01004-06.  Further, a series of water and soil tests conducted by the Ecuadorian government failed to detect any glyphosate contamination near the border in northern Ecuador.  SUPP.APP-00301, 00828-48.

7

**II.    Plaintiffs' Failure to Substantiate Their Self-Selected, Representative Test Cases.**

This lawsuit was initially filed in the U.S. District Court for the District of Columbia on September 11, 2001, as a putative class action on behalf of 10,000 Ecuadorians living within ten miles of the border with Colombia.  The complaint, *Arias v. DynCorp International, et al.*, alleged that the spraying operations had caused severe personal injuries, including deaths and birth defects, as well as widespread destruction of farm animals and crops.  SUPP.APP-00005-11.  The complaint alleged that the Plan Colombia spraying operations were being conducted as part of a conspiracy with foreign oil companies in a "mercenary war" to intimidate the local population against opposing oil operations in the region.  SUPP.APP-00013-15.  The plaintiffs brought claims under international law, alleging that the DynCorp defendants (hereinafter "DynCorp International") had engaged in torture and cruel, inhuman or degrading treatment.  SUPP.APP-00019-20.

In 2002, DynCorp International moved to dismiss the *Arias* complaint.  In late 2006 and early 2007, a series of copycat complaints subsequently consolidated as *Quinteros v. DynCorp International*, *et al.* were filed in the Southern District of Florida.  These complaints alleged personal injury and property damages claims on behalf of ultimately 3,266 individual plaintiffs and *parens patriae* claims on behalf of the three

Ecuadorian provinces that border Colombia: Sucumbios, Esmeraldas, and Carchi. APP-00257-58. On May 21, 2007, the U.S. District Court for the District of Columbia granted in part and denied in part DynCorp International's motion in *Arias*, dismissing the plaintiffs' claims under the Torture Victims Protection Act, but allowing the plaintiffs to proceed to discovery on their remaining claims. APP-00115. On May 22, 2007, the Southern District of Florida transferred the *Quinteros* actions to the District Court for the District of Columbia (hereinafter "the District Court"). The *Arias* plaintiffs subsequently dropped their class action demand, and the *Quinteros* and *Arias* cases were consolidated for purposes of case management and discovery.[1] APP-00225-55.

On November 27, 2007, the District Court conducted a status conference to map a path forward in the litigation. During this conference, the District Court and the parties discussed three issues that would prove to be central to the ultimate disposition of the litigation: (1) the court's concerns about whether Plaintiffs would be able to establish causation, (2) the court's requirement that each individual plaintiff provide factual

---

[1] The *Arias* plaintiffs also dropped their allegations of wrongful deaths and birth defects, as well as their bizarre accusation that Plan Colombia was part of a mercenary war on behalf of oil companies. APP-00225-55.

disclosures sufficient to set forth a *prima facie* case, and (3) the selection of "test" plaintiffs to allow for the efficient resolution of the litigation.

### A.    Plaintiffs' Failure to Proffer the Expert Testimony They Repeatedly Promised and Acknowledged Was Necessary to Meet Their Burden of Proof

The District Court put Plaintiffs on notice about its doubts regarding their causation case at the very beginning of the litigation. At the November 27, 2007 initial status conference, the District Court warned Plaintiffs that "defendants have raised legitimate questions about . . . causation," 11/27/07 Hr'g Tr. at 9:17-20 (APP-00189), and ordered Plaintiffs to provide expanded initial disclosures for each of the individual plaintiffs that would state at least a *prima facie* causation case. The District Court cautioned Plaintiffs that even for purposes of initial disclosures, they would need "something more than simply a temporal connection, 'we were living a good life, we know some spraying happened, and then things started happening.'" *Id.* at 13:9-12 (APP-00193).

As detailed below, Plaintiffs failed to provide the court-ordered disclosures, and at the next status conference in 2008, the District Court again warned Plaintiffs that "one of the [Court's] concerns" was what Plaintiffs would proffer as "evidence of causation." *See* 11/25/08 Hr'g Tr. at 21:19-20 (APP-00301); *see also id.* at 60:1-3 ("what we talked about from

day one was the evidence or information concerning causation was skimpy, it just wasn't there.") (APP-00340).  In response, Plaintiffs represented that they would be establishing causation through expert testimony.  Plaintiffs stated that they would be proffering a general causation expert from Ecuador named Dr. Maldonado as "one of our key witnesses." *Id.* at 9:12-23 (APP-00289).  Plaintiffs further represented that they had "experts who are examining the aerial photography," and that they were "talking to some other medical experts."  Plaintiffs assured the District Court that any test plaintiffs would "receive extensive medical examinations from a new expert who will be the medical expert at trial." *Id.* at 20:13-24 (APP-00300).  And Plaintiffs stated that they would be proffering experts who would be conducting "an analysis of the drift and the direct application in Ecuador" and "modeling of air dose, inhalation, and those types of issues . . ." to establish dose and duration of the alleged exposures. *Id.* at 55:24-56:3 (APP-00335-36).

In response to the District Court's continued questioning at the next status conference in 2009, Plaintiffs again acknowledged their burden to support their allegations with expert testimony.  Plaintiffs assured the court that they would be proffering "very, very detailed, both medical expert reports as well as other experts, *satisfying our burden of proof on all the*

*various issues*." 7/17/09 Hr'g Tr. at 48:13-16 (emphasis added) (APP-00475). Plaintiffs represented that "our experts are going to issue very detailed Rule 26 reports with regard to these cases, and those – that analysis of their complaints and the exposure and wind patterns and all the other manner of evidence that we're going to produce at the time of trial . . . ." *Id.* at 48:1-5 (APP-00475).

On June 3, 2010, Plaintiffs once again assured the court that they had "damages experts that are currently working" and "medical doctors looking at our people." 6/3/10 Hr'g Tr. at 33:16-17, 33:23-24 (SUPP.APP-00216). They further confirmed that they "absolutely" would be proffering "drift experts," "toxicology experts," and "soil experts," stating that they likewise were already "working with those other experts." *Id.* at 37:1-24 (SUPP.APP-00220); *see also id.* at 35:17-36:25 (SUPP.APP-00218-19).

As late as December 14, 2010 – just three days before they were to produce their expert reports – Plaintiffs told the District Court that they "would expect our main expert [at trial] to be a toxicologist who could speak to the effects of the chemicals on human health and also on crops and animal health." 12/14/10 Hr'g Tr. at 7:18-8:1 (SUPP.APP-00234-35). While Plaintiffs' counsel would not predict how many other plaintiff experts would testify at trial, he stated that he would "be surprised if that would be the only

12

expert," and he again indicated that Plaintiffs might be calling an expert on "drift, the way the chemical moves through the air," "more than one toxicology specialist, somebody who could opine on human health, and another person who could talk about the effects on plants and/or animals," as well as potentially other experts "depending on what types of experts DynCorp would be putting forward." *Id.* at 8:9-21 (SUPP.APP-00235).

Three days later, Plaintiffs proffered only a single expert, Dr. Michael Wolfson, a medical doctor who later testified that he had *only first learned of the plaintiffs one week before* and who opined *solely with respect to personal injury causation.* APP-00935; Wolfson Dep. Tr. at 443:14-444:3 (SUPP.APP-00708-09). Dr. Wolfson did not offer any opinions regarding: (1) the levels of Plaintiffs' alleged exposures to Plan Colombia herbicide, or (2) causation with respect to Plaintiffs' animal and crop damages claims. Wolfson Dep. Tr. at 7:23-8:14, 9:9-12, 100:7-10 (SUPP.APP-00704-07). Plaintiffs made no mention of the various doctors, toxicologists, soil experts, drift experts, and damages experts with whom they purportedly had been working over the prior years, and they offered no explanation – then or since – for their failure to proffer any of the experts that they repeatedly had assured the District Court they would be relying upon to satisfy their burdens of proof. The District Court subsequently excluded Dr. Wolfson's

13

personal injury causation opinions under *Daubert* as scientifically unreliable, a ruling that Plaintiffs notably do not challenge on appeal.  APP-1209-30.

While stunning in light of their repeated representations to the District Court to the contrary, Plaintiffs' failure to proffer any expert testimony in support of their claims is easily explained.  As detailed in the reports of DynCorp International's experts in herbicide drift, human health, animal toxicity, and crop damages (each retained to respond to Plaintiffs' purportedly forthcoming expert case) – and as demonstrated in scientific studies by U.S. and Colombian government agencies and the OAS-retained expert panel, *see supra* at 5-7 – there is no reliable medical or scientific basis for any of the Plaintiffs' claims.

Plaintiffs properly have abandoned their human and animal health allegations on appeal, and DynCorp International accordingly will not belabor the overwhelming scientific evidence demonstrating that those allegations are without merit.  For the Court's reference, however, this evidence is set forth at SUPP.APP-00295-365, 00416-91, 00884-994.  With respect to the Plaintiffs' crop damages claims, DynCorp International's experts demonstrated that there was no scientific evidence that any herbicide had drifted into Ecuador and that Plaintiffs' allegations of crop damages were inconsistent with the well-established effects of glyphosate-based

herbicides and readily explained by the high prevalence of tropical plant

diseases in northern Ecuador. *See* SUPP.APP-00257, 00378, 00449, 00888,

00957.

　　　As explained by DynCorp International's expert weed scientist, Dr.

Joseph DiTomaso, Plaintiffs were required as a threshold step in their crop

damage allegations to provide scientific evidence of the level of herbicide

that allegedly reached the crops:

> As with all "toxic" exposures, the response of a
> plant to glyphosate is generally dependent upon
> the concentration to which the plant is exposed.
> Very low exposures can produce no effects or even
> stimulation in growth. Higher sublethal doses can
> produce transient symptoms from which plants
> will eventually recover, and still higher doses will
> produce symptoms that will kill plants.

SUPP.APP-00266 (footnote omitted).

　　　In a 2009 peer-reviewed publication, the independent expert panel for

OAS presented data on the exposure levels of Plan Colombia herbicide that

would be necessary to kill a variety of crop species. *See* SUPP.APP-00817;

SUPP.APP-00449-50. The OAS panel compared these toxic doses to the

level of herbicide that would deposit on crops under worst-case drift

scenarios and concluded that the Plan Colombia spraying operations *could*

*not cause any crop damage beyond a buffer of 50 to 120 meters* from the

spray swath. SUPP.APP-00817. DynCorp International's drift expert, Dr.

Andrew Hewitt, who co-authored the drift study for OAS, conducted a
separate drift analysis in this litigation and found that the worst-case levels
of herbicide drift from Plan Colombia spray operations in southern
Colombia, even directly across the border river from Ecuadorian farms,
would be far below that required to cause the alleged crop damage.
SUPP.APP-00957.

Dr. Hewitt's drift findings were confirmed by a separate expert
analysis of before-and-after satellite imagery at the Colombia-Ecuador
border.  The imagery below, presented by DynCorp International's satellite
imagery expert, Dr. Barry Evans, shows the impact of the Plan Colombia
herbicide spraying in southern Colombia, where the targeted coca crops
were being grown, and directly across the river in Ecuador.  These satellite
images are presented in color infrared, with vegetation represented in
various shades of red and bare soil in various shades of blue.  The satellite
images demonstrate the impact of the spraying operations on coca in
Colombia, with no corresponding impacts on vegetation south and east of
the border river in Ecuador (in the bottom right corner of the images):

**Before Spraying Operations**



Figure 4.  September 12, 2002 Landsat image

**After Spraying Operations**



Figure 8a. October 14, 2002 (Landsat) image

*See* SUPP.APP-00899, 00910.  A more comprehensive analysis of this and

other satellite imagery presented in combination with GPS data from the

17

Plan Colombia spray planes is set forth in Dr. Evans' expert report, at
SUPP.APP-00884-924.

Further, as Dr. DiTomaso explained, even at sufficiently high
exposure levels, glyphosate is not associated with the types of damages
alleged by the test plaintiffs.  The test plaintiffs alleged that their crops died
within a day or two of the alleged spray operations and showed visible black
spotting, but glyphosate-based herbicides take nearly a week to cause visible
plant damage and do not cause spotting.  SUPP.APP-00265, 00276-77.  Dr.
DiTomaso also reviewed the limited videographic and photographic
evidence of crop damage proffered by the test plaintiffs and did not see any
of the well-established symptoms of glyphosate damage.  SUPP.APP-00281-
82, 00284-87.  Moreover, DynCorp International's tropical plant disease
expert, Dr. Randy Ploetz, explained that this same evidence revealed classic
signs of pathological diseases, a finding that is wholly unrelated to herbicide
exposure and that was corroborated by scientific testing that identified the
very same pathogens in the crops.  SUPP.APP-00378, 00383-90.

Plaintiffs had the opportunity to designate rebuttal experts in response
to the analyses presented by Drs. Hewitt, Evans, DiTomaso, and Ploetz.
They did not do so.  Instead, the only rebuttal expert Plaintiffs designated
was Dr. Wolfson, who again limited his opinions to alleged human health

effects.  APP-00959-77.  As noted above, Dr. Wolfson's opinions were
subsequently excluded in a ruling that Plaintiffs do not appeal.

> **B.**    **Plaintiffs' Repeated Failures to Provide Court-Ordered Disclosures Setting Forth _Prima Facie_ Support for Their Claims**

At the November 27, 2007 status conference, the District Court
ordered each of the individual plaintiffs to provide initial disclosures setting
forth the basic who, what, when, and where facts needed to state a cause of
action, explaining that these disclosures were "going to be pretty essential in
moving the case forward."  11/27/07 Hr'g Tr. at 11:19-20 (APP-00191).
The District Court explained that the initial disclosures would need to
explain "the basis for the plaintiffs' belief that the defendants' conduct
caused the injuries they're claiming," noting that "to move the case forward
to get some of these issues teed up, it would be required to put in some basis
of that type."  _Id._ at 12:2-4, 14:3-5 (APP-00192, 00194).  The District Court
noted that these were the kinds of facts that Plaintiffs' counsel should have
obtained before filing suit.  _Id._ at 11:22-12:4 (APP-00191-92).

Plaintiffs' counsel assured the District Court that they would provide
these facts in their initial disclosures, due on January 28, 2008.  They failed
to do so, however, beginning what turned out to be a two-year saga in which
the District Court repeatedly ordered Plaintiffs to provide _prima facie_

disclosures for each individual plaintiff, and Plaintiffs repeatedly violated those orders.

Following Plaintiffs' failure to meet the District Court's January 28, 2008 deadline, the parties filed a consent notice in which Plaintiffs committed to disclose the foundational facts for their claims in their responses to jointly-approved Plaintiffs' Questionnaires, to be provided between April 25, 2008 and August 25, 2008.  However, Plaintiffs missed this deadline as well, producing instead woefully-deficient Questionnaire responses for only a portion of the plaintiffs.

On October 21, 2008, Plaintiffs admitted their noncompliance with the District Court's disclosure requirements and asked the Magistrate Judge for yet another extension of time.  The Magistrate Judge denied Plaintiffs' request.  Instead, the Magistrate Judge issued an order requiring each individual plaintiff to "provide verified, factual, and complete responses" to the Plaintiffs' Questionnaires and to supplement their deficient Questionnaire responses by:

- Providing the month, day and year of each alleged exposure to the "Plan Colombia" herbicide, and then responding to all follow-up questions with respect to each such alleged exposure event;

- [M]arking . . . the maps appended to the Questionnaire to show where the plaintiffs, their affected farms, and/or

20

their affected farm animals were located when each
alleged exposure event occurred;

- [Submitting all] medical records in accordance with the
  instructions in the Questionnaire by the plaintiffs who
  claim health injuries . . . ; and

- Providing . . . each individual plaintiff's monetary
  computation of each category of damages claimed.

SUPP.APP-00047-48.  The Order warned that individual plaintiffs who

failed to provide adequate Questionnaire responses prior to the next status

conference could be dismissed with prejudice.  SUPP.APP-00049-50.

Plaintiffs filed objections to this Order with the District Judge.  On

November 25, 2008, the District Judge rejected Plaintiffs' objections,

reaffirming the Magistrate Judge's requirement that "completed

questionnaires and supplements" be produced by each individual plaintiff,

but giving Plaintiffs another extension of time to provide the ordered

information.  11/25/08 Hr'g Tr. at 24:5-6 (APP-00304).  The District Judge

again put Plaintiffs on notice that failure to comply would result in

dismissal.  The court explained that "There are going to be, presumably,

some people who aren't going to come up with anything and those people

just need to go, I guess."  *Id.* at 23:17-19 (APP-00303).  The District Court

also urged Plaintiffs "to focus hard on some of the details that are missing

from the questionnaires, to allow both sides to hone in on what we're going

to end up being left with." *Id.* at 44:3-6 (APP-00324). On December 1, 2008, the District Court issued a written order directing the parties to return to court after the new disclosure deadline with a joint motion "to dismiss nonresponsive plaintiffs and plaintiffs without claims." SUPP.APP-00051.

As Plaintiffs' counsel conceded when the issue was next raised with the court, Plaintiffs did nothing in response to the District Court's order. *See* 5/5/09 Hr'g Tr. at 9:5-23, 18:21-19:12 (SUPP.APP-00060, 00069-70). They did not provide any of the ordered supplemental disclosures, nor did they make any further efforts to provide foundational facts for the individual plaintiff claims.

On February 19, 2009, the parties filed a joint motion to dismiss nonresponsive plaintiffs and plaintiffs without claims. The parties agreed to the dismissal of 712 individual plaintiffs (subsequently revised to 681) who had failed to provide any Questionnaire responses but disagreed over the large majority of remaining individual plaintiffs, whose Questionnaire responses DynCorp International believed to be deficient. On July 17, 2009, the District Court held that some but not all of the remaining plaintiffs identified by DynCorp International should be dismissed. The District Court identified two categories of individual plaintiffs who should be dismissed, and instructed the parties to meet and confer about which plaintiffs fit within

these two categories.  The parties thereafter agreed that 425 of the remaining
individual plaintiffs should be dismissed but disagreed as to 165 others.  On
January 12, 2010, the District Court dismissed all 580 plaintiffs with
prejudice.  While Plaintiffs now appeal the dismissal of 163 of the disputed
165 individual plaintiffs, they do not appeal the District Court's dismissal
with prejudice of the other noncompliant individual plaintiffs.

### C.   The Plaintiffs' Selection of "Representative" Test Cases

In the parties' November 19, 2007 Rule 16.3 Statement, Plaintiffs
proposed that the case proceed by way of a group of test plaintiffs, whom
Plaintiffs alone would select.  Plaintiffs stated that they would "select cases
for the first trial group that in Plaintiffs' opinion, have good exposure, good
causation, and good damages," noting that "if DynCorp were to defense the
'best' Plaintiff picks, that is quite telling of the value of the remainder of the
case."  APP-00158.  Plaintiffs further argued that "a trial on a test group of
Plaintiffs will also answer dispositive issues applicable to the entire Plaintiff
population."  APP-00159.

On November 27, 2007, the District Court accepted Plaintiffs' test
case approach in part, but held that each side would be allowed to pick ten of
the twenty test plaintiffs for trial.  The District Court noted that allowing
each side to select test plaintiffs

> may skew the issue of getting a representative
> sampling where the representative sampling of the
> plaintiffs might be somewhere in the middle, but I
> think it is a fairer approach for both sides to be
> able to achieve ends that each side might want to
> achieve in identifying strengths and weaknesses in
> a case for purposes of going forward after an initial
> grouping has been identified and put through the
> grinder.

11/27/07 Hr'g Tr. at 10:10-17 (APP-00190). The District Court ordered the

parties to meet and confer following Plaintiffs' production of court-ordered

initial disclosures and Questionnaire responses, and provide the court with a

designation of test plaintiffs by September 25, 2008 (a date subsequently

extended due to Plaintiffs' disclosure violations and delays described

above). *Id.* at 43:5-7 (APP-00223).

    Defendants agree that under the District Court's initial selection

criteria, the test plaintiffs' claims were not expected to be binding on non-

test plaintiffs. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1018-19 (5th

Cir. 1997) (holding that selection by both defendants and plaintiffs does not

result in representative test cases that could bind remaining plaintiffs).

Indeed, this is the same selection criteria used in *In re TMI Litigation*, upon

which Plaintiffs heavily rely. 193 F.3d 613, 627 (3d Cir. 1999) (noting that

court adopted case management plan whereby test plaintiffs were "half

chosen by plaintiffs and half chosen by defendants").[2]  However, at Plaintiffs' specific urging, this was not the selection criteria ultimately adopted by the District Court.

On November 25, 2008, the District Court conducted a status conference to discuss Plaintiffs' noncompliance with the court's *prima facie* fact disclosure orders.  The District Court noted that "one of the concerns I guess I explained early on in the case was evidence of causation" and he pressed Plaintiffs to explain how they "would expect, for example, to survive summary judgment on the causation."  11/25/08 Hr'g Tr. at 21:19-22:9 (APP-00301-02).  The District Court then stated his objective that the parties select "a representative group of whatever the magic number of plaintiffs might have been . . . figuring out if there is some summary judgment motions that ought to be filed with respect to them, weeding out what needs to be weeded out, *if there's still a case to be tried with respect to some test group*, then going forward with that."  *Id.* at 26:19-27:11 (APP-00306-07) (emphasis added).  The District Court indicated that it was reconsidering its approach on the selection of test plaintiffs, because "[y]ou

---

[2] *See also In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 998 (9th Cir. 2007) (parties agreed on bellwether plaintiffs); *Eggar v. Burlington N. R.R. Co.*, No. CV 89-159-BLG-JFB, 1991 WL 315487, at *1 (D. Mont. Dec. 18, 1991) (court selected six test plaintiffs from the parties' list of proposed test plaintiffs).

really do need to get more of a representative cross sample rather than the best case from the plaintiff and the best case from the defendant." *Id.* at 28:12-15 (APP-00308).

On March 23, 2009, the parties filed separate proposals for the selection of test plaintiffs. In their proposal, Plaintiffs again urged the District Court to allow them to select all of the test cases, focusing on the District Court's November 2008 comments on the importance of representative test cases. Plaintiffs argued that the court "should ensure that the sample is representative of <u>all</u> claims encompassed in the particular proceeding" because "the only way in which useful information [is] to be derived from bellwether plaintiffs is if their claims are both representative and of sufficient gravity to give shape and measure to the ultimate liabilities and exposures presented." APP-00409-10. Plaintiffs contended that the approach previously adopted by the District Court – with each side picking half of the test plaintiffs – would be "lacking in representativeness." APP-00411, n.3. And Plaintiffs argued – in a key assertion nowhere mentioned in their appellate brief – that the District Court's prior approach should be discarded because "although the selections might facilitate settlement, *no binding effect could be given to the outcome for the remaining claims.*" *Id.*

Plaintiffs told the District Court that they were "in the best position to select representative cases" and that they alone "should take the laboring oar in selecting the test group of representative Plaintiffs." APP-00411. Plaintiffs asserted:

> The most rational and meaningful approach is for Plaintiffs themselves to select plaintiffs based on the factors likely to influence the outcome of the case as a whole: illness and exposure. A representative group of plaintiffs suffering from the most characteristic diseases and drawn from a reasonable cross-section of exposure zones would best educate all the parties about the strengths and weaknesses of the claims as a whole. This best satisfies the objectives of judicial efficiency.

APP-00413. Plaintiffs did allow that their proposed approach was "likely to result in some of the strongest cases going first," but argued that there "is no inherent harm or vice in that approach" and that "Plaintiffs should be permitted to put their best foot forward." APP-00410, 00412.

On July 17, 2009, the District Court accepted Plaintiffs' argument and ordered that Plaintiffs alone would select the test plaintiffs. 7/17/09 Hr'g Tr. at 35:25-36:25 (APP-00462-63). Contrary to Plaintiffs' suggestion, the District Court never stated that the resolution of these test plaintiffs' claims could not or would not bind the rest of the plaintiffs. To the contrary, while the District Court recognized that future trials *might* be necessary following the test cases (as indeed they might have been if the test cases were not

27

resolved on general causation issues common to all plaintiffs), the court also noted that they might not.  On April 30, 2010, following Plaintiffs' request for clarification of the court's test case selection order,[3] the District Court explained that in adopting Plaintiffs' proposal, it had accepted a "plan to pursue and take a test trial group first and then revisit whether either settlement can occur or *whether additional discovery and trials might have to take place.*"  4/30/10 Hr'g Tr. at 5:15-18 (APP-00526) (emphasis added).

## SUMMARY OF ARGUMENT

Plaintiffs ask this Court to ignore their repeated representations to the District Court and reinstate personal injury and property damage claims for which they were unable to provide any expert support, even after securing the right to unilaterally select their best-case, representative test plaintiffs. The Court should deny this request.

Plaintiffs had more than four years to put together an expert case and, if their counsel are to be believed, they worked with numerous experts over the years in an effort to do just that.  They were unable to do so, however,

---

[3] Plaintiffs' motion for clarification shows that Plaintiffs understood the binding effect of the test cases on the remaining plaintiffs.  The motion argued that the individual *Arias* plaintiffs should proceed to trial on a separate track, because "[b]y including the *Arias* plaintiffs in the pool of plaintiffs subject to the sample trial plaintiff process, the *Arias* plaintiffs would effectively be consolidated with the *Quinteros* plaintiffs for purposes of trial too."  APP-00500.

and their *post hoc* rationalization that expert testimony was not necessary for their crop damages claims is contrary to a solid wall of legal authority (discussed *infra*).  Plaintiffs' fall-back argument that they be allowed to seek non-physical, nominal damages was not raised below (and is thus waived), and in any event, it is wrong as a matter of law.

Plaintiffs secured the right to unilaterally select test plaintiffs by arguing that this was the only selection method that would produce representative test cases that could bind the other individual plaintiffs.  They thereby consented to the District Court's application of its summary judgment rulings against the test plaintiffs to all of the plaintiffs, and they also are judicially estopped from taking a different position on appeal.  Further, if Plaintiffs truly believed that the District Court misunderstood their test case proposal, Plaintiffs' proper course was to raise that issue with the District Court.  The Plaintiffs' failure to do so separately waives this issue on appeal.

The District Court's dismissal of the Provincial Plaintiffs' claims for lack of prudential and Article III standing is in accord with this Court's binding precedent, which Plaintiffs fail to even mention.  The Provinces make no effort on appeal to establish prudential standing, rendering moot any consideration of the separately required Article III standing.  But their

derivative claims that purported personal injuries and property damages of their residents caused increased government expenditures are, in any event, too remote to establish injury-in-fact for constitutional standing.

Finally, the District Court acted well within its discretion in dismissing 163 individual plaintiffs who, after being warned of the consequences of noncompliance, ignored repeated court orders requiring them to provide the most basic *prima facie* disclosures about (a) where they were allegedly exposed to herbicide spray and (b) some measure of their alleged damages.

## ARGUMENT

### I.  The District Court Properly Held Plaintiffs to Their Burden to Proffer Expert Testimony In Support of Their Toxic Tort Claims.

#### A.  The District Court Correctly Granted Summary Judgment on Plaintiffs' Crop Damages Claims.

Plaintiffs do not challenge the District Court's holdings that the test plaintiffs' failure to proffer reliable expert evidence in support of their personal injury and animal loss claims entitled DynCorp International to summary judgment on those claims as a matter of law.  Those claims accordingly have been abandoned.  Plaintiffs argue, however, that the test plaintiffs should be allowed to go forward with their crop damages claims, arguing that "courts make case-by-case determinations concerning expert requirements" and positing that expert testimony should not be required to

30

establish that the Plan Colombia herbicide damaged their crops.  Notably,
however, Plaintiffs fail to cite to a single herbicide crop damage case in
which any court has so held.[4]  Plaintiffs rely instead on wholly inapposite
cases involving prison fights,[5] paint fumes causing dizziness,[6] and sparks
igniting oil.[7]

In fact, the need for expert testimony in herbicide crop damage cases
is well established.  For example, in *Burton v. Theobold*, 216 N.W.2d 299,
300 (Iowa 1974), the Iowa Supreme Court reversed a jury verdict in favor of
a plaintiff who had proffered no expert testimony that his neighbor's aerial
spraying of the herbicide 2,4-D had damaged his trees.  The court explained:
"We believe the damage [to evergreen trees] claimed here requires some
expert testimony to establish the properties and effects of 2,4-D [herbicide].
It is not the type of damage which an ordinary juror might determine without
such help." *Id.* at 300.  Likewise, in *Clifford v. UAP Distribution, Inc*., No.
08-2094, 2010 WL 55671 (C.D. Ill. Jan. 4, 2010), *aff'd sub nom. Clifford v.*

---

[4] Plaintiffs sought to identify such cases at the District Court, but DynCorp
International demonstrated that all of their cited cases were inapposite.
SUPP.APP-00875-79.  Plaintiffs no longer rely on any of those cases on
appeal.

[5] *Morgan v. District of Columbia*, 824 F.2d 1049, 1061-63 (D.C. Cir. 1987).

[6] *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 59 (2d Cir. 1996).

[7] *Jimenez v. Hawk*, 683 A.2d 457, 462-63 (D.C. 1996).

*Crop Prod. Servs., Inc.*, 627 F.3d 268 (7th Cir. 2010), the court granted

summary judgment to the defendants when plaintiffs failed to proffer expert

testimony that glyphosate had damaged his corn crop.  The court held that

"[t]estimony regarding . . . [whether the herbicide was] the cause of damage

to the seed corn crop constitutes 'scientific, technical, or other specialized

knowledge' as described in Federal Rules of Evidence 702."  *Id.* at *4.

Numerous other courts have reached the same conclusion.[8]

In a case involving similar allegations of aerial herbicide drift causing

crop damage, a federal district court in Idaho detailed the causation issues

---

[8] *See Adams v. United States*, Civ. No. 03-0049-E-BLW, 2009 WL 2584822, at *2 (D. Idaho Aug. 8, 2009) (holding in herbicide drift case that "whether [herbicide] caused crop injury is a matter for expert testimony"); *Smith v. Penn Tank Lines*, No. Civ. 00-220-JD, 2001 WL 575101, at *2 (D.N.H. May 29, 2001) ("The court agrees that the properties and operation of a pesticide for use in an apple orchard is beyond jurors' general knowledge and experience."); *Graham v. Canadian Nat'l Ry. Co.*, 749 F. Supp. 1300, 1318 (D. Vt. 1990) (causal relationship between alleged negligent herbicide spraying and crop damage was "not obvious to the ordinary lay person" and turned on "expert opinion evidence in the field[] of . . . botanical science"); *Partridge v. Younghein*, 277 N.W.2d 100, 101-03 (Neb. 1979) (affirming summary judgment to defendants where plaintiff supported allegation that herbicide drift from aerial spraying damaged his trees solely with his own testimony); *Silbernagel v. W. Farmers Ass'n*, 556 P.2d 1369, 1370-72 (Or. 1976) (affirming directed judgment for defendant because plaintiff failed to proffer any expert testimony that herbicide caused crop damage); *see also Kleiss v. Cassida*, 696 N.E.2d 1271, 1276-77 (Ill. App. Ct. 1998) (affirming j.n.o.v. for defendant based on exclusion of plaintiffs' only expert linking herbicide drift to alleged crop damage); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558-60 (Tex. 1995) (affirming entry of

that require expert testimony.  The court explained that in addition to the specific causation issue whether the herbicide in fact damaged a particular crop, plaintiffs must present expert testimony on several general causation issues:  "(1) the amount of [the herbicide] necessary to damage crops; (2) the length of time that [the herbicide] remains viable in the soil; (3) how [the herbicide] works on plants to cause damage; (4) the winds necessary to transport [the herbicide]; (5) the sensitivity of various crops to [the herbicide]; and (6) symptoms of [the herbicide] damage."  *Adams*, 2009 WL 2584822, at *1-2.  Plaintiffs here failed to proffer expert testimony on any of these issues.  The District Court's grant of summary judgment on the crop damages claims should be affirmed.

### B.     Plaintiffs Have Waived Any Claim For Non-Physical or Nominal Damages.

Having failed to proffer any admissible expert evidence in support of their personal injury and property damages claims, Plaintiffs now argue that the District Court should have denied DynCorp International's motions for summary judgment in part to allow them to pursue claims for non-physical damages.  This argument fails for three reasons.

First, it is axiomatic that "[a]bsent exceptional circumstances, a party

---

directed verdict for defendant following exclusion of plaintiffs' expert on claim that herbicide-contaminated fungicide damaged pecan orchard).

cannot raise legal issues on appeal that it failed to raise in the district court."

*Belhas v. Ya'alon*, 515 F.3d 1279, 1284 (D.C. Cir. 2008); *see also*

*Conservation Force, Inc. v. Jewell*, --- F.3d ---, No. 11-5316, 2013 WL

4417452, at *4 n.6 (D.C. Cir. Aug. 20, 2013) ("It is the general rule . . . that

a federal appellate court does not consider an issue not passed upon below.")

(internal quotation marks omitted).  In Defendants' Motion for Summary

Judgment Based on the Plaintiffs' Lack of Necessary Excerpt Testimony,

DynCorp International sought "summary judgment on all of the test

plaintiffs' claims" because Plaintiffs failed to proffer "the expert evidence

necessary to survive summary judgment on causation."  APP-00842-47.  In

opposition, Plaintiffs argued that expert testimony on causation was not

necessary.  APP-01047-48.  They did not argue that the District Court

should deny summary judgment in part because their battery, trespass,

nuisance, and emotional distress claims were based on non-physical or

nominal damages.  Plaintiffs accordingly have waived this issue on appeal,

and the Court need not consider it further.[9]

---

[9] Plaintiffs did raise some (but not all) of these arguments in response to a
separate, stand-alone summary judgment motion that was mooted by the
District Court's granting of the motions on appeal.  To avoid waiver,
however, Plaintiffs were required to raise the arguments in response to the
summary judgment motions here at issue.  *United States v. British Am.
Tobacco (Invs.) Ltd.,* 387 F.3d 884, 887-88 (D.C. Cir. 2004) (finding waiver
based on a party's failure to raise privilege claims in the proceedings

Second, it is well settled under D.C. law, that "an appellate court will not reverse a judgment merely for the purpose of permitting the recovery of nominal damages." *Henson v. Prue*, 810 A.2d 912, 916 (D.C. 2002); *see also Dannhausen v. Bus. Publ'ns Audit of Circulation, Inc.*, 797 F.2d 548, 552 (7th Cir. 1986) (same; following Illinois state law); *Indus. Dev. Bd. of Section, Ala. v. Fuqua Indus., Inc.*, 523 F.2d 1226, 1231-32 (5th Cir. 1975) ("federal courts have consistently refused to reverse a trial court determination on the ground that nominal damages should have been awarded"). Accordingly, even if Plaintiffs had preserved their right to bring claims, *e.g.*, for "a few drops" of glyphosate on a hand that causes no injury, App. Br. at 44, or for a "fear of . . . spray planes" that likewise caused no measurable damage, *id.* at 45, that would not entitle them to a reversal for a trial for nominal relief that "would be a waste of resources and would serve no useful purpose." *Wood v. Neuman*, 979 A.2d 64, 73 (D.C. 2009).

Third, Plaintiffs' assertion that they can proceed on their battery, trespass, nuisance and emotional distress claims without any expert evidence of actual harm is wrong as a matter of law. Plaintiffs' trespass, nuisance, and emotional distress claims each require Plaintiffs to establish physical

resulting in the interlocutory appeal, even though the party had asserted the privilege in a related proceeding in the same case).

injury or property damage or at least a reasonable fear of such harms.[10]  And

Plaintiffs' battery claim required them to establish that DynCorp

International knew that the alleged exposures to Plan Colombia herbicide

were "practically certain to follow" from the aerial eradication operations, a

showing they cannot begin to make without the foundational testimony of a

drift expert that such exposures were even possible.  *Acosta Orellana*, 711 F.

Supp. 2d at 90-91; *see also id.* at 93-94 (same intent burden for trespass).

## II.    The District Court Properly Applied Its Summary Judgment Rulings to All of the Individual Plaintiffs.

Plaintiffs' argument that the District Court erred in applying its

summary judgment rulings to all plaintiffs rests on a fundamental

mischaracterization of the procedural record in this case.  Contrary to their

---

[10] *See Acosta Orellana v. Croplife Int'l*, 711 F. Supp. 2d 81, 93 (D.D.C. 2010) (in cases involving alleged "trespass based on particle deposits," D.C. law requires proof of "actual harm to the property"); *Wood*, 979 A.2d at 78 ("To be actionable as a nuisance, the offending thing must be marked by some degree of permanence") (internal quotation marks omitted); *Lowrey v. Glassman*, 908 A.2d 30, 37 (D.C. 2006) ("[D]amages flowing from a nuisance are measured by the diminution of the property's value caused by the nuisance's interference with the enjoyment of property.") (internal quotation marks omitted); *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011) (for emotional distress claim, plaintiffs must prove that they were within a "zone of physical danger" that caused them to fear for their own safety); *Ross v. DynCorp*, 362 F. Supp. 2d 344, 360 (D.D.C. 2005) (plaintiff must show "that the defendant's conduct caused him or her to suffer emotional upset of so acute a nature that harmful physical consequences might not be unlikely to result") (internal quotation marks omitted).

arguments on appeal, Plaintiffs argued below that test cases selected by them would be representative and binding. *See supra* at 23-28. The non-test plaintiffs thereby agreed to be bound by the results in the test cases. Further, because Plaintiffs made those arguments in a successful motion to secure the right to unilaterally select the test plaintiffs, they are judicially estopped from challenging the binding and representational nature of the test cases on appeal. Moreover, Plaintiffs failed to provide the District Court with an opportunity – through a Rule 59(e) motion – to address what they claim was a mistaken understanding of their intent to be bound, and they have thus waived the argument here.

### A.   Plaintiffs Consented to be Bound by the Court's Rulings on Their Self-Selected Test Cases.

Plaintiffs concede that the District Court's application of its summary judgment rulings to all plaintiffs would be appropriate if the non-test plaintiffs consented to be bound by the test cases. App. Br. at 29-31. As Plaintiffs acknowledge, the United States Supreme Court specifically so stated in *Taylor v. Sturgell*, 553 U.S. 880, 893-94 & n.7 (2008), where it also noted the Restatement (Second) of Judgments' position that such consent might be shown "not only by express or implied agreement, but also through conduct inducing reliance by others." Plaintiffs thus do not challenge the propriety of the numerous opinions in which courts in such circumstances

37

have applied holdings in test-plaintiff cases to the remaining non-test plaintiffs.  *See Abbe v. City of San Diego, Cal.*, 444 F. App'x 189, 189-90 (9th Cir. 2011) (cited by Plaintiffs at App. Br. 30-31); *Adams v. United States*, 658 F.3d 928, 930 (9th Cir. 2011) (discussing use of binding bellwether trial in herbicide drift case); *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 359 (2d Cir. 2003) (discussing bellwether approach where the parties agreed to be bound); *Mwani v. Laden*, --- F. Supp. 2d ---, No. 99-125(JMF), 2013 WL 2325166, at *1, n.1 (D.D.C. May 29, 2013) (discussing use of binding bellwether trial procedure).

Plaintiffs argue instead that the non-test plaintiffs did not agree to be bound by the test cases.  But they remarkably fail to mention the key language in their March 23, 2009 test plaintiff selection proposal in which Plaintiffs addressed this very point.  Through this pleading, Plaintiffs not only consented to be bound by the test cases, they successfully secured the ability to unilaterally select the test cases by persuading the District Court that this was the only way for the test cases to have a "binding effect . . . for the remaining claims."  APP-00411, n.3.  As another court noted in remarkably similar circumstances, this fact is dispositive:  "The Court, having acceded to DuPont's request that a bellwether trial be used to resolve liability and general causation issues, cannot . . . permit a re-trial of any

issue of general causation tried and resolved by the bellwether trial." *Adams v. United States*, 4:CV 03-49-BLW, 2011 WL 4738528, at *4 (D. Idaho Oct. 6, 2011).[11]

But that is not all.  Plaintiffs on appeal likewise flatly disregard their March 23, 2009 filing in arguing that the test cases are non-binding because "Plaintiffs' unitary selection of all Test Plaintiffs without scientific or statistical analysis was not a representative sample of the entire Plaintiff pool."  App. Br. at 27.  In sharp contrast to this appellate argument, Plaintiffs convinced the District Court to adopt this "unitary selection" approach by arguing that Plaintiffs were "in the best position to select representative cases."  APP-00411.  Indeed, in their March 23, 2009 motion, Plaintiffs asserted that their method of selecting test plaintiffs would be "representative" (or that Defendants' alternative method would not be "representative") no fewer than 20 times.  APP-00406-17.  Moreover, after the District Court acceded to Plaintiffs' position, Plaintiffs confirmed in correspondence with DynCorp International that they were "evaluating the criteria to ensure that we have 20 plaintiffs who are representative." SUPP.APP-00148.

---

[11] "Dupont had originally requested a bellwether trial on the ground that it would be 'helpful in applying the outcome of the bellwether trials to the

Plaintiffs' contention that DynCorp International's summary judgment briefing focused solely on specific causation (whether the Plan Colombia spraying caused the test plaintiffs' specifically-alleged damages) and not general causation (whether the Plan Colombia spraying could have caused damage in Ecuador) is also inaccurate.  *See* App. Br. at 14-16.[12]  DynCorp International sought summary judgment on both general causation and specific causation grounds, *see* APP-00804-05, 00849-855, 00871-75, and the District Court's summary judgment rulings were based on Plaintiffs' failure to substantiate their general causation claims.  APP-01195-1205, 01207-08, 01220-21, 01229.  This case thus stands in sharp contrast to *In re TMI Litigation*, in which plaintiffs proffered admissible expert testimony that "cancer rates, and specifically lung cancer and leukemia rates, increased following the [Three Mile Island] accident in those areas estimated to have been in the path of the alleged radioactive plume."  193 F.3d at 712.  The summary judgment holding in that case turned on the *TMI* test plaintiffs'

---

claims of the remaining plaintiff grower groups . . . .'"  *Id.* at *1 (citation omitted).

[12] Plaintiffs place great weight on the fact that DynCorp International's motions for summary judgment were directed at the twenty test plaintiffs. But that is exactly what the test case approach anticipates.  The relevant question on appeal is whether the District Court properly applied its summary judgment rulings on the test cases to the non-test plaintiffs.  As set forth herein, it did.

failure to establish exposures at levels they had agreed were necessary for specific causation. *Id.* at 716-17.[13]

Plaintiffs specifically argued for the right to select the test cases on the grounds that their selections would be representative of and binding on the remaining plaintiffs. Having thus set the stage for the District Court's dismissal of the non-test plaintiffs' claims, Plaintiffs cannot credibly seek refuge in the argument that Rule 56(f) entitles them to additional notice. Nor do Plaintiffs identify any general causation expert that they would have proffered in support of the non-test plaintiffs that would have led to a different outcome for their claims. *See Sadie v. City of Cleveland*, 718 F.3d 596, 601 (6th Cir. 2013) (rejecting Rule 56(f) notice argument due to lack of prejudice); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("It is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail."). The District Court's application of its summary

---

[13] *See also Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 311, 314-15 (5th Cir. 1998) (rejecting plan whereby defendant was deemed to have caused asbestos-related disease of non-test plaintiffs without any evidence of specific causation and based on test plaintiff trial that made no "determination of whether a Pittsburgh Corning product was a cause of that disease"); *Hogan v. Allstate Ins. Co.*, 210 F. Supp. 2d 1312, 1318-20 (M.D. Fla. 2002) (ruling as to test plaintiffs' entitlement to back wages based on individualized assessment of job responsibilities), *aff'd in part, vacated in part*, 361 F.3d 621, 625-628 (11th Cir. 2004).

judgment rulings to the remaining plaintiffs is exactly the result for which

Plaintiffs bargained.[14]

### B.    Plaintiffs Are Judicially Estopped from Arguing that the Test Cases Are Not Binding on the Remaining Plaintiffs.

Even if Plaintiffs could somehow show that they did not intend by

their March 2009 statements to consent to be bound by the test cases, they

are judicially estopped from making that argument.  The question of how the

test plaintiffs would be selected was hotly contested below, with Plaintiffs

repeatedly arguing for the right to select the test plaintiffs unilaterally and

DynCorp International arguing for selections by both parties or by a random

selection approach.  As discussed *supra* at 23-28, the District Court

---

[14] Preclusion is also appropriate under the unique facts in this case because the non-test plaintiffs exercised control over the test-plaintiffs' claims through their common Plaintiffs' counsel, who is unilaterally controlling the entire litigation.  *See Gulf Power Co. v. F.C.C.*, 669 F.3d 320, 323 (D.C. Cir. 2012) (preclusion appropriate "where the party sought to be barred exercised such control over the prior litigation that he can be said to have 'had his day in court' even though he was not a formal party") (internal quotation marks omitted).  While the existence of common counsel does not ordinarily establish privity for purposes of preclusion, deposition discovery below demonstrated that the individual Ecuadorian plaintiffs have no understanding of this litigation and, in many instances, were unaware that they were even plaintiffs in a U.S. legal proceeding.  SUPP.APP-00165-84; *see also Gortat v. Capala Bros.*, --- F. Supp. 2d ---, No. 07CV 3629(ILG), 2013 WL 2566622, *2 (E.D.N.Y. June 12, 2013) ("[It] has long been recognized [that class action] cases tend to be dominated by entrepreneurial attorneys who effectively control all phases of the litigation.") (citation omitted).

originally held that defendants would be able to select some of the test cases. But in their March 2009 filing, Plaintiffs argued that only plaintiff-selected test cases would be representative and binding, and Plaintiffs convinced the District Court to change its position. *See* App. Br. at 12 (acknowledging that the District Court "altered its prior position" based on Plaintiffs' March 23, 2009 submission).

This is exactly the purpose for which judicial estoppel exists. Judicial estoppel "protect[s] the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks and citation omitted). "Courts may invoke judicial estoppel '[w]here a party assumes a certain position in a legal proceeding, . . . succeeds in maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position.'" *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 792 (D.C. Cir. 2010) (quoting *Comcast Corp. v. F.C.C.*, 600 F.3d 642, 647 (D.C. Cir. 2010)); *New Hampshire*, 532 U.S. at 749).

Courts look to three factors in deciding whether to apply judicial estoppel, each of which calls for estoppel here:

43

First, "a party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire*, 532 U.S. at 750. In their appellate brief, Plaintiffs argue that the test plaintiffs they selected were not representative and should not be binding. In the District Court, Plaintiffs argued that the unitary selection approach they advocated was necessary for the test cases to be binding on the remaining plaintiffs, in significant part because their selection approach would assure that the test cases were representative. *See supra* at 26-27. These positions are diametrically opposed.

Second, "courts regularly inquire whether the party has succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled." *New Hampshire*, 532 U.S. at 750 (internal quotation marks omitted). Plaintiffs here succeeded in persuading the District Court to adopt their test plaintiff selection approach based upon the exact positions they now ask this Court to reject.

Third, courts consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751. This factor likewise weighs heavily in favor of estoppel. Through their inconsistent

positions below, Plaintiffs secured the ability to proceed with what they acknowledged would be their strongest and best test plaintiffs and to secure general rulings on those "best" cases that they most certainly would have argued were binding on DynCorp International if favorable to the Plaintiffs. DynCorp International defeated those claims after three years of extensive (and expensive) fact and expert discovery. This defense included multiple trips to Ecuador to depose the test plaintiffs and other fact witnesses, exhaustive efforts to uncover evidence from the remote Ecuadorian border region where the test plaintiffs' alleged damages occurred (which resulted in evidence that was uniformly contrary to Plaintiffs' claims), extensive work with the numerous defense experts discussed above to analyze and take apart the test plaintiffs' allegations (both on general and specific causation grounds), and preparation for a promised Plaintiffs' expert case that never materialized. Plaintiffs now request that the Court ignore their prior inconsistent positions so as to put DynCorp International through the exact same exercise with yet another (and then another and another) round of test cases. This is clearly an unfair detriment.

### C.    **Plaintiffs Waived Any Argument that the District Court Misunderstood Their Position by Failing to Seek Post Judgment Relief.**

Moreover, if Plaintiffs believed that the District Court was mistaken in applying its summary judgment rulings to the non-test plaintiffs, they were required to raise that issue with the District Court through a post-judgment motion under Fed. R. Civ. P. 59(e).  *See Berger v. Heckler*, 771 F.2d 1556, 1561 (2d Cir. 1985) (discussing party's Rule 59(e) motion to vacate district court's extension of consent decree to nonparties); *cf. Hogan*, 361 F.3d at 628 (addressing propriety of applying test case rulings to non-test plaintiffs only after plaintiffs raised issue below in a motion for reconsideration).  By failing to do so, Plaintiffs have waived their right to challenge this aspect of the District Court's summary rulings on appeal.  *See Jones v. Horne*, 634 F.3d 588, 603 (D.C. Cir. 2011) (party will not be heard for the first time on appeal after failing to file motion to amend or vacate judgment under Rule 59(e)); *Nemariam v. Fed. Democratic Republic of Eth.*, 491 F.3d 470, 483 (D.C. Cir. 2007) (same).

Plaintiffs ask this Court to conclude that the District Court reversed course on its understanding of the binding nature of Plaintiffs' test plaintiff selection proposal, pointing to carefully-excerpted District Court statements made during three years of pre-trial proceedings.  This Court cannot and

should not answer this question in the first instance.  If Plaintiffs had

properly raised the issue below through a Rule 59(e) motion, the District

Court would have provided this Court with a record explaining its rulings by

which the District Court's exercise of discretion could be judged.  *See GSS*

*Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811-13 (D.C. Cir. 2012) (district

court's ruling on Rule 59(e) motion reviewed for abuse of discretion).

Plaintiffs failed to seek such relief from the District Court, and they

accordingly cannot raise the issue here.

### III.   The District Court Properly Dismissed the Three Provincial Plaintiffs for Lack of Prudential and Constitutional Standing.

To invoke the Court's jurisdiction, Plaintiffs must satisfy "both

constitutional and prudential standing" requirements.  *Am. Trucking Ass'ns*

*v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 246 (D.C. Cir. 2013)

(citations omitted).  The District Court properly held that the Provincial

Plaintiffs failed to establish either constitutional or prudential standing,[15] but

the Provinces appeal only the first ruling.  Because the Provinces thus have

---

[15] APP-00648 (Provinces lack both Article III standing and standing to sue
in *parens patriae*); *see also Serv. Emps. Int'l Union Health & Welfare Fund
v. Philip Morris Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001) (*parens patriae*
is "a species of prudential standing").

waived any claim of prudential standing,[16] the Court need not address the Provinces' constitutional standing argument, and the District Court's dismissal of the Provinces must be affirmed. *See Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 179 (D.C. Cir. 2012) ("We need not decide here whether the food group has established Article III standing with this theory because the theory plainly fails to demonstrate prudential standing.").

In any event, the Provinces' argument that they established Article III standing is without merit. As the District Court correctly held, the Provinces' claims of adverse budgetary impacts based on the effects of the spraying operations on their residents are too remote to establish "injury in fact" for constitutional standing. *See Serv. Emps. Int'l*, 249 F.3d at 1071, 1074 (holding that foreign governments' claims of harms to their treasuries arising from impacts of tobacco on public health were "too remote from the defendants' alleged wrongdoing to provide antitrust or RICO standing"); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 226 (2003) (holding that alleged injury was too remote to provide Article III standing).

---

[16] *See Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013) (arguments not raised in opening appellate brief are waived).

### A.    The Provinces' Lack of Prudential Standing Requires Dismissal of All of Their Claims.

In *Service Employees International*, the Court held that foreign governments lack prudential *parens patriae* standing to bring suit in U.S. courts for alleged injuries to their citizens or to the governments' quasi-sovereign interest in providing for those citizens' alleged increased health care needs.  249 F.3d at 1073 (*citing Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 336 (1st Cir. 2000)); *see also State of São Paulo of the Federative Republic of Braz., v. Am. Tobacco Co.*, 919 A.2d 1116, 1121-22 (Del. 2007) (holding that Republic of Panama and Brazilian State of São Paulo lacked prudential standing in U.S. court).  The District Court thus correctly held that the Provinces lack prudential standing, and the Provinces do not dispute that holding on appeal.  App. Br. at 47-51.

That holding is fatal to the Provinces' case.  As the District Court noted, the Provinces are not seeking recovery for damages to any proprietary interests.  *See* APP-00657-58 ("the provincial plaintiffs fail to allege any possessory interest or title in the [alleged] injured livestock, animals, crops and timber"); APP-00659 ("there is no allegation that environmental damage has affected lands in which the provincial plaintiffs possess a protectable interest").  Nor can the Provinces create a proprietary interest by arguing that the spraying operations damaged them through increased government costs.

"When a governmental body acts in its sovereign or quasi-sovereign capacity, seeking to enforce the laws or promote the public well-being, it cannot claim to have been injured in [its] . . . property . . . based solely on the fact that it has spent money in order to act governmentally." *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008) (internal quotation marks omitted) (discussing distinction between proprietary and sovereign or quasi-sovereign interests for purposes of RICO standing).

Rather, all of the Provinces' claims seek to protect *parens patriae* interests that the Provinces have no standing to pursue in U.S. courts. *See Serv. Emps. Int'l*, 249 F.3d at 1071 (foreign governments lack prudential standing to seek recovery for alleged "economic harms to their treasuries" from increased health care costs); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353-54 & n.6 (8th Cir. 1985) (holding that State's alleged increased financial responsibility for the welfare and support of its citizens implicate *parens patriae*, not proprietary interests). Accordingly, the District Court's ruling dismissing the Provinces must be affirmed.

### B.   The Provinces' Alleged Damages Are Too Remote to Provide Constitutional Standing.

*Service Employees International* is also dispositive with respect to the Provinces' lack of constitutional standing. As in this case, the foreign governments in *Service Employees International* sought recovery for alleged

increased health care costs purportedly caused by tortious misconduct of the defendants (there relating to the marketing of tobacco products). 249 F.3d at 1070-71. The Court held that these alleged increased costs were too remote to provide standing, explaining that: (1) the foreign governments' alleged damages were "highly speculative and difficult to calculate given the many other potential causes for the alleged financial injuries," *id.* at 1073, (2) allowing the government plaintiffs to proceed would "require complex rules for apportioning damages between potential plaintiffs removed from the alleged wrongdoing by different levels of injury, as well as create a very real possibility of duplicative recoveries against the defendants," *id.* at 1075, and (3) "individual smokers constitute a group of potential plaintiffs possessed of more direct claims who can be counted on to deter the alleged wrongdoing by asserting state law theories of recovery." *Id.* at 1076. The same holding is appropriate here.[17]

Each of these three remoteness factors demonstrates the Provinces' lack of standing. The Provinces alleged, through their expert witness, Dr. Fishkind, that they were damaged from the Plan Colombia spraying

---

[17] While *Service Employees International* discussed remoteness in the specific context of antitrust or RICO standing, this and other courts have held that the remoteness inquiry also speaks to Article III standing. *See In re African-Am. Slave Descendants Litig.*, 471 F.3d 754, 761 (7th Cir. 2006) (citing D.C. Circuit and other case law); *see also infra* at 54 & n. 20.

operations in the full amount of the Provinces' budget deficits from 2001 to

2007.[18]  APP-00536-42.  But the District Court found that the Provinces

"fail[ed] to present facts to support the conclusion that Plan Colombia

caused the direct monetary damages of budget deficits complained of here."

APP-00656.  The Provinces likewise failed to provide any evidence that the

Plan Colombia spraying caused their alleged expenditures for new schools

and medical brigades (which they acknowledge were in response to an infant

mortality rate of 29.4% and an epidemic of infectious diseases).  APP-

00584, 00590, 00600.  To the contrary, the need for these expenditures is

readily explained by what the United Nations has reported are endemic

poverty and public health problems that long pre-date the Plan Colombia

spraying.[19]  Even the Provinces' own damages expert, Dr. Fishkind, pointed

to numerous other causes for the Provinces' budgetary woes.  APP-00656.

---

[18] Dr. Fishkind also opined as to alleged damages to natural resources and
the speculative cost of relocating every individual living within 10
kilometers of the Ecuador-Colombia border due to alleged environmental
contamination.  APP-00542-00545.  The Provinces make no mention of, and
thus abandon, these *parens patriae* claims on appeal.  *See Alaska Sport
Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773 (9th Cir. 1994) (government
claims brought for damages to natural resources and the environment caused
by Exxon Valdez accident are in *parens patriae*); *Puerto Rico v. Bramkamp*,
654 F.2d 212, 215 n.5 (2d Cir. 1981) (citing line of Supreme Court authority
for the proposition that a state claim to protect its natural resources and
environment is brought in *parens patriae*).

[19] *See* United Nations, Interagency Assessment of Ecuador's Northern
Border Region (2004) (noting, *inter alia*, that poverty rates in the region are

Second, as the District Court correctly found, the Provinces also provide "no factual basis to support a conclusion that these costs will be borne by the provinces as opposed to private parties, the national government, or national or international relief organizations." APP-00661. As detailed above, the Plaintiffs failed to proffer evidence that the spraying operations caused any adverse impacts in Ecuador. However, if there were a colorable claim for damages, "even the most lengthy and expensive trial could not in the final analysis, cope with the problems of double recovery inherent in allowing damages for harm both to the economic interests of individuals and for quasi-sovereign interests of the State." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972).

Third, there is no need to allow the Provinces to protect the alleged interests of their citizens because over three thousand of those citizens brought suit against DynCorp International on their own behalf. "That Plan Colombia allegedly has affected individual citizens' welfare – by, for example resulting in an increase in [medical problems] – does not result in a

---

upwards of 95%, that chronic malnutrition rates exceed 30%, and that between 80% and 100% of the households in the region lack basic needs). Cited below at SUPP.APP-00146, and available at http://www.jposc.org/documents/workshop_cuba_Summary_UN_Mission_ North_Border_Ecuador.ppt#281,23,Actions in 4 main Areas

direct or otherwise non-attenuated injury to the provinces." APP-00661.

"Rather, this is the type of claim that an individual plaintiff is in the best

position to raise and pursue, and it is the very type of injury that the

individual plaintiffs have alleged here." *Id.*

The Provinces remarkably make no mention of *Service Employees*

*International* in their appellate brief. At the District Court, the Provinces

sought to distinguish the case by arguing that it was limited solely to RICO

and antitrust claims, but this argument failed at the threshold because the

foreign governments in *Service Employees International* also brought claims

under D.C. common law. *See* 249 F.3d at 1076 & n.6. *Service Employees*

*International* thus affirmed the dismissal on remoteness grounds of all of the

foreign governments' claims, including their claims for fraud, intentional

misrepresentation, negligent misrepresentation, negligence and gross

negligence, and negligent performance of a voluntary undertaking. *See In re*

*Tobacco/Governmental Health Care Costs Litig.*, 83 F. Supp. 2d 125, 127

(D.D.C. 1999), *aff'd sub nom. Serv. Emps. Int'l*, 249 F.3d 1068. Other

courts likewise have rejected this alleged distinction.[20]

---

[20] As the Sixth Circuit explained in holding "alleged injuries . . . too remote
to afford standing under any of the asserted causes of action," *Perry v. Am.
Tobacco Co.*, 324 F.3d 845, 848 (6th Cir. 2003), "remoteness principles are
not limited to cases involving the RICO statute." *Id.* at 850 (citing, *inter
alia*, *Serv. Emps. Int'l*, 249 F.3d at 1076 n.6.); *see also Camden Cnty. Bd. of*

Finally, contrary to the Provinces' suggestion, App. Br. at 49-51, the

District Court's Article III standing ruling was not based upon the

Provinces' failure to establish proximate causation but rather on their failure

to establish "injury in fact." *See* APP-00651; *see also Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560-61 (1992) (constitutional standing requires (1)

injury in fact, (2) traceability, and (3) redressibility). *Lujan* holds that "the

'injury in fact' test requires more than an injury to a cognizable interest. It

requires that the party seeking review be himself among the injured." *Id.* at

563. Thus, in order to establish Article III standing, "[t]he plaintiff must

show that he himself is injured by the challenged action of the defendant."

---

*Chosen Freeholders v. Beretta U.S.A. Corp.,* 123 F. Supp. 2d 245, 256 n.6
(D.N.J. 2000) (explaining in dismissing negligence-based common law
claims that "case law is clear that remoteness of injury is an element to be
examined in determining whether a plaintiff has standing to sue because his
injuries were proximately caused by the defendant's conduct"); *Ganim v.
Smith & Wesson Corp.*, 780 A.2d 98, 119-20 (Conn. 2001) ("to state these
basic propositions another way, if the injuries claimed by the plaintiff are
remote, indirect or derivative with respect to the defendant's conduct, the
plaintiff is not the proper party to assert them and lacks standing to do so");
*District of Columbia v. Beretta U.S.A. Corp.*, No. Civ.A. 0428-00, 2002 WL
31811717, at *24-26 (D.C. Super. Ct. Dec. 16, 2002) (relying on remoteness
analysis in *Service Employees International* and *Ganim* in dismissing D.C.'s
common law negligence claim against gun manufacturers for lack of
standing), *aff'd in part and rev'd in part on other grounds*, 872 A.2d 633
(D.C. 2005).

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977).

The Provinces' general allegations that the Plan Colombia spraying operations reduced their tax revenues and increased their costs, App. Br. at 47-48 (citing Fishkind report, APP-00536-0542), does not demonstrate injury in fact. In *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976), this Court explained that "impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." *See also Block*, 771 F.2d at 354 (same, quoting *Kleppe*). Moreover, the Provinces' alleged damages from the Plan Colombia spraying operations are all derivative of the alleged injuries of their residents – for which the individual plaintiffs themselves brought suit and were unable to substantiate. The District Court properly dismissed the Provinces for lack of Article III standing, and for this reason as well, the District Court's ruling should be affirmed.

## IV.  The District Court Acted Within Its Discretion in Dismissing 163 Individual Plaintiffs for Repeated Violations of the Court's Orders to Provide a Prima Facie Basis for Their Claims.

Plaintiffs' failure to proffer admissible general causation evidence that the Plan Colombia spraying operations were even capable of causing personal injuries and property damage in Ecuador renders moot their

separate appeal of the dismissal of 163 plaintiffs who violated the District Court's disclosure orders.  But this separate appeal further highlights the extent to which Plaintiffs are asking the Court to excuse their repeated failures to proffer even the most basic information in support of their claims.

The 163 individual plaintiffs at issue – like the other 427 individual plaintiffs whose dismissals in the same District Court order Plaintiffs do not appeal – were dismissed for repeated violations of court orders requiring them to state (1) where they were located at the time of their alleged exposures to Plan Colombia herbicide and (2) what damages they allegedly incurred.  This information would be readily available to any plaintiff with a good faith basis for bringing suit.  But the 163 plaintiffs at issue repeatedly failed to provide this information, even after the District Court made clear that continued noncompliance would result in dismissal with prejudice.

The District Court acted well within its discretion in dismissing these plaintiffs. *See Founding Church of Scientology of Wash., D.C., Inc. v. Webster*, 802 F.2d 1448, 1457 (D.C. Cir. 1986) ("As in other cases of dismissal imposed as a sanction, the applicable standard of review confines appellate inquiry to whether the District Court abused its discretion."). Indeed, as the District Court noted, other courts have similarly dismissed individual plaintiffs in the exact same circumstances. APP-00518-19 (citing

57

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1233-34 (9th Cir. 2006) (affirming dismissal of both nonresponding plaintiffs and plaintiffs who submitted incomplete plaintiffs' fact sheets because the omitted disclosures were of "information that only they [the individual plaintiffs] possessed regarding the critical elements of their claims.")).

Plaintiffs' argument that dismissal with prejudice was too harsh a sanction is completely divorced from the record in this case. "Consistent with the deference due to the district court in reviewing a discovery sanction imposed under Rule 37, [the Court's] obligation is not just to scrutinize the conclusion but to examine with care and respect the process that led up to it." *Bonds v. District of Columbia*, 93 F.3d 801, 804 (D.C. Cir. 1996) (internal quotation marks omitted). Here, as the District Court explained (and as discussed *supra* at 19-23), the 163 individual plaintiffs were dismissed only after they violated multiple court orders, only after they failed to provide good cause for their noncompliance, and only after they were fully advised of the consequences of noncompliance:

> It has been over two years since the plaintiffs were first directed to complete the defendants' questionnaires. Multiple orders have directed the plaintiffs to respond in full to the questionnaires and the plaintiffs have received three extensions of time in which to do so. Despite these orders and extensions of time, however, the plaintiffs now argue that the defendants should draw their own

> conclusions from the incomplete information in the
> plaintiff's questionnaires. . . .
>
> [P]laintiffs have demonstrated no good cause
> entitling them to yet another extension of time to
> comply with discovery obligations with which they
> should have complied long ago.

APP-00517-18; *see also* APP-00517 (noting that earlier court order had

warned that noncompliant plaintiffs would be dismissed "with prejudice");

11/25/08 Hr'g Tr. at 23:17-19 (explaining that plaintiffs who fail to provide

adequate questionnaire responses "just need to go") (APP-00303).

    This two-year history amply supports the District Court's

discretionary finding that the 163 plaintiffs' discovery violations were

willful.  *See* APP-0516 ("While a Rule 37(b) dismissal usually follows some

showing of willfulness, bad faith or fault, a plaintiff's persistent failure to

comply with discovery and discovery-related orders can be viewed as willful

where multiple warnings and second chances have been given to the

plaintiffs." (citing *Handy v. Shaw, Bransford, Veilleux & Roth*, No. 00-2336

(CKK), 2006 WL 3791387, at *8 (D.D.C. Dec. 22, 2006) and *Smith v.

O'Neill*, No. Civ.A. 99-00547(ESH/DAR), 2001 WL 950219, at *6 (D.D.C.

Aug. 3, 2001)).  Likewise, these individual plaintiffs' failure to take any

action whatsoever to supplement their Questionnaire responses after being

warned that their claims would be dismissed with prejudice belies any claim

that a lesser sanction would have been effective. *See* APP-00519 (finding no indication that "a lesser sanction would be effective" where "these plaintiffs have repeatedly resisted prodding to plainly state data to which they have access").[21]

This Court has repeatedly upheld district courts' exercise of their Rule 37 discretion in dismissing claims in similar circumstances. *See Albert v. Starbucks Coffee Co.*, 213 F. App'x 1, 1-2 (D.C. Cir. 2007) (affirming dismissal for failure to comply with a single discovery order that had noted possibility of dismissal for noncompliance); *Church of Scientology*, 802 F.2d at 1458-59 (affirming dismissal where party had notice of the consequences of noncompliance); *Weisberg v. Webster*, 749 F.2d 864, 867 (D.C. Cir. 1984) (affirming dismissal following plaintiff's "willful and repeated refusals to answer [interrogatories] in compliance with court orders").[22]  The Court should do the same here.

---

[21] Plaintiffs also argue that they should be excused for their failures to provide adequate Questionnaire responses because those responses were not necessary for Plaintiffs to select test cases.  The District Court rejected that argument below.  11/25/08 Hr'g Tr. at 53:13-25 (APP-00333).  Plaintiffs' continued disagreement with the District Court's discovery orders did not entitle Plaintiffs to ignore them.

[22] *Bonds* is not to the contrary.  In that case, the sanction was based upon a failure to respond to a single broadly-worded interrogatory seeking the identity of every individual with knowledge of matters set forth in 220 paragraphs in a complex class-action complaint.  *Bonds*, 93 F.3d at 805-06.  The Court rejected the sanction because the party (1) had initially responded

Finally, Plaintiffs argument that the District Court violated the "law of the case" by "applying a different standard than it previously established for determining the sufficiency of questionnaire responses for damages identification and exposure location" is spurious.  The Magistrate Judge's October 21, 2008 Order, upheld by the District Judge on December 1, 2008, required each individual plaintiff to provide a specific location for their alleged exposures and a monetary computation of each category of damages claimed.  SUPP.APP-00051.  Plaintiffs ignore this Order in their appellate brief (much as they ignored it below) and instead direct the Court to general statements made at a subsequent July 2009 hearing in which the District Court *explained the dismissal ruling that Plaintiffs now appeal*.  App. Br. at 55.  The 163 individual plaintiffs, of course, did not take any action in response to these July 2009 statements, which were, in any event, fully consistent with the District Court's dismissal of their claims.[23]  And the

---

to the interrogatory in good faith, (2) had supplemented its response following the court order at issue, (3) had explained that its difficulties in responding to the interrogatory were occasioned by the illness of the responsible attorney, and (4) had demonstrated its good faith by meeting numerous other discovery deadlines within the same three month period at issue, which included producing 66 witnesses for deposition  *Id.* at 805, 811-12.

[23] For example, during the July 2009 hearing, the District Court specifically instructed Plaintiffs that they needed to provide information as to the location of an alleged exposure beyond a simple reference to a farm, noting "if the defendants in good faith do not know where that farm is because the

Plaintiffs' citation to their woefully inadequate "factual submissions" with regard to these individual plaintiffs' location of exposure and damages disclosures, APP-00492, 00495, provides no basis for the Court to second-guess the District Court's informed conclusions that the disclosures were inadequate. *See also* SUPP.APP-00151-58 (responding in detail to Plaintiffs' "factual submissions").

Plaintiffs' insistence that this Court should overrule the District Court's discretionary ruling and reinstate individual plaintiffs who were unable to provide even the location of their alleged exposures or any quantification of their alleged damages is a testament to the utter vacuousness of Plaintiffs' personal injury and property damages allegations. The 163 individual plaintiffs were properly dismissed.

---

plaintiffs haven't provided that information, we just need to cut bait." 7/17/09 Hr'g Tr. at 24:19-25:8 (APP-00451-52). Notably, during this discussion, Plaintiffs' counsel limited his argument to individual plaintiffs who alleged exposure "on my farm." *Id.* at 23:17-19 (APP-00450). He never argued that an allegation of exposure on "a farm" or "the farm" would be sufficient. *See also id.* at 26:12-21 (Plaintiffs' counsel's acknowledgment that some individual plaintiffs who did not identify location of their farms would be dismissed) (APP-00453).

## CONCLUSION

After extending Plaintiffs every opportunity to make a case during

more than a decade of spurious allegations and false representations, the

District Court properly granted summary judgment to DynCorp International

on all of the Plaintiffs' claims. For the reasons set forth herein, the District

Court's summary judgment and dismissal rulings in favor of DynCorp

International should be affirmed.


Dated:  October 28, 2013                    Respectfully Submitted,

                                            Joe G. Hollingsworth
                                            Eric G. Lasker
                                            Rosemary Stewart
                                              HOLLINGSWORTH LLP
                                              1350 I Street, NW
                                              Washington, D.C. 20005
                                              Phone: (202) 898-5800
                                              Fax: (202) 682-1639
                                              elasker@hollingsworthllp.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of 14,000 words of

   Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 13,916 words,

   excluding the parts of the brief exempted by Fed. R. App. P.

   32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

   because it has been prepared in a proportionally-spaced typeface using

   MS Word for Microsoft Office 2003 in Times New Roman at 14 point.


Dated:  October 28, 2013                    Respectfully Submitted,

                                            Joe G. Hollingsworth
                                            Eric G. Lasker
                                            Rosemary Stewart
                                            HOLLINGSWORTH LLP
                                            1350 I Street, NW
                                            Washington, D.C. 20005
                                            Phone: (202) 898-5800
                                            Fax: (202) 682-1639
                                            elasker@hollingsworthllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of October 2013, I caused to be filed a true and correct copy of the foregoing Opposition Brief for the Appellees and the Appellees' public Supplemental Appendix by operation of the Court's Electronic Case Filing System.  Participants in the case who are registered users of the Court's Electronic Case Filing System will be served by that System.  I further certify that on October 28, 2013:  eight copies of the Opposition Brief; eight copies of the public Supplemental Appendix; and eight copies of the sealed supplement to the Supplemental Appendix were filed in person with the Clerk of the Court.  In addition, one copy of the public Supplemental Appendix and one copy of the sealed supplement to the Supplemental Appendix were served via courier on:

> Terrence Collingsworth
> Conrad & Scherer, LLP
> 1156 15th Street, NW
> Suite 502
> Washington, DC 20005
> tc@conradscherer.com
> 202-543-4001

Respectfully Submitted,

Joe G. Hollingsworth
Eric G. Lasker
Rosemary Stewart
   HOLLINGSWORTH LLP
   1350 I Street, NW
   Washington, D.C. 20005
   Phone: (202) 898-5800
   Fax: (202) 682-1639
   elasker@hollingsworthllp.com